# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

KENNETH BERGE, ET AL.,           )
                                      )
                       Plaintiffs,     )      Civil Action No. 10-373 (RBW)
                                        )
                 vs.             )
                                        )
UNITED STATES OF AMERICA, ET AL.,   )
                                      )
                     Defendants.     )
_____)

## OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs' motion for a preliminary injunction is another attempt by plaintiffs to have this Court prematurely reach the merits in this action brought pursuant to the Administrative Procedure Act ("APA"). There has been no final agency action for this Court to review and, hence, plaintiffs cannot maintain a claim under the APA. *See* Defendants' Motion to Dismiss Or, In the Alternative, to Hold This Action in Abeyance (Dkt. #12). Rather, the TRICARE Management Activity ("TMA") within the Department of Defense ("DoD") which administers the basic DoD medical health services program at issue in this litigation is currently conducting a review based on recent medical literature as to whether Applied Behavior Analysis ("ABA") is a covered medical treatment for autism under the TRICARE Basic Program and, correspondingly, whether plaintiffs are entitled to reimbursement for ABA therapy. Thus, with there having been no final agency action, plaintiffs cannot demonstrate that they have a likelihood of success on the merits.

As TMA nears the completion of its review, plaintiffs have filed this motion for a preliminary injunction six months after the filing of their complaint (which was not served until six weeks after it was filed). In fact, plaintiffs' own delay by a month in submitting materials to

the agency has delayed the administrative proceedings; TMA now anticipates issuing a decision on November 3, 2010, rather than the original date of September 20, 2010. Plaintiffs cannot show that they are likely to suffer irreparable harm in waiting for TMA to complete its review. It would take more time for TMA to administratively implement an order to cover all ABA therapy under the Basic Program during the pendency of this litigation, the relief that plaintiffs seek, than it would take for TMA to complete its review.

In their motion, plaintiffs have ignored the harms that would be caused by the relief that they seek. First, those who are now eligible for reimbursement for ABA under a TRICARE extended benefits program may have their access to ABA therapy limited if there was an expansion of those eligible for reimbursement. Next, there would be fiscal and administrative costs in making operational changes to what is considered a covered benefit in a complex benefits system such as TRICARE. Further, it is not in the public interest to bypass an established administrative process for determining whether a certain therapy is a proven medical modality covered under the Basic Program.

After submitting voluminous materials to the agency for review on August 30, 2010, plaintiffs filed this motion for a preliminary injunction on September 2, 2010. In doing so, plaintiffs in effect are asking this Court to substitute its judgment for that of the agency's, but to do so without having the benefit of knowing the agency's final decision or having the administrative record upon which any decision would be based. Plaintiffs have not only asked this Court to act in the absence of a final agency decision and administrative record, but have sought to expand the scope of the hearing on the motion for a preliminary injunction by seeking live testimony from a senior government official. *See* Exhibit 1 (Subpoena for Testimony of

- 2 -

Rear Admiral Hunter, Deputy Director of TMA); Defendants' Motion to Quash Subpoena of

Admiral Hunter (Dkt. #56).  The hearing contemplated by plaintiffs could impermissibly delve

into an agency's ongoing decision-making process when judicial review of any decision, should

such a decision be subject to judicial review, would be confined to an administrative record.

This Court should reject plaintiffs' invitation to decide the medical nature of ABA and its

efficacy without the agency having an opportunity to exercise its judgment in reviewing the

medical literature on the subject in light of what is considered "reliable evidence."

## BACKGROUND

**I.      Statutory and Regulatory Background**

In 1956, Congress established a military health care system to "provid[e] an improved

and uniform program of medical and dental care for members of the uniformed services and their

dependents."  *See* Dependents' Medical Care Act, Pub. L. No. 84-569; 1956 U.S. Code Cong.

And Admin News ("USCAAN"), p. 301; *see also* Pub. L. No. 85-861; 1958 USCAAN, p. 1731;

10 U.S.C. 1071 et seq.  This 1956 law established, *inter alia*, a system for the Secretary of

Defense to contract for basic health insurance, medical service or health plans for dependents of

active duty service members.  *See* 1956 USCAAN, p. 303-4; *see also* 10 U.S.C. 1079(a).  In

1966, Congress expanded this basic coverage to dependents of retirees.  *See* Pub. L. No. 98-614;

1966 USCAAN, p. 1020; *see also* 10 U.S.C. 1086(c).

In accordance with its statutory mandate, the Department of Defense has implemented

regulations for the administration of the DoD health program commonly referred to originally as

the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), and later

as the TRICARE Program.  *See* 32 C.F.R. Part 199.  TMA administers this health benefit

program for the DoD.[1]  The purchased care portion of this health benefit plan, the TRICARE

Basic Program, is essentially a supplemental program to the care provided by the Uniformed

Services in the Military Treatment Facilities (i.e., military hospitals), also referred to as the DoD

"direct medical care system."  *See* 32 C.F.R. § 199.4(a).  TRICARE is a statutory program of

medical benefits.  It is "similar to private insurance programs," *see id*., but is "not an insurance

program in that it does not involve a contract guaranteeing the indemnification of an insured

party against a specified loss in return for a premium paid," *see* 32 C.F.R. § 199.1(d).  It is

designed to provide financial assistance to [TRICARE] beneficiaries for certain prescribed

medical care obtained from civilian sources."  *See* 32 C.F.R. § 199.4(a).  "Subject to all

applicable definitions, conditions, limitations, or exclusions specified in this part, the

[TRICARE] Basic Program will pay for medically necessary services and supplies required in

the diagnosis and treatment of illness or injury . . .."  *See* 32 C.F.R. § 199.4(a)(1)(i).  These

payments will be made for authorized care provided to eligible beneficiaries by authorized

providers.  *See id*.

      TRICARE contractors are the primary means of adjudicating and processing claims.

When an individual submits a claim for reimbursement under the TRICARE Basic Program, a

TRICARE contractor makes an initial determination as to whether the service or treatment is a

covered TRICARE benefit under the Basic Program pursuant to TRICARE regulations and

policy manuals.  *See* 32 C.F.R. § 199.1(f)(1); *see also* 32 C.F.R. § 199.2 (definition of initial

determination); 32 C.F.R. § 199.10(a)(1) (appeal rights of initial determinations).  This includes

making a determination that the claim is from an eligible beneficiary, that it is for an authorized

---

[1] The regulations still use the acronym CHAMPUS, which, for the purposes of this
litigation, can generally be substituted for TRICARE.

service, and that the care was provided by an authorized provider. *See* 32 C.F.R. §§ 199.6, 199.7. In other words, if the service or treatment is an otherwise covered benefit, the contractor still has to make an individualized assessment on the particular claim "to ensure [its in] compliance" with the TRICARE regulations with respect to the individual beneficiary. *See* 32 C.F.R. § 199.7.

A service or treatment is generally covered under the Basic Program if it is deemed to be a proven necessary medical service, *see* 32 C.F.R. § 199.4(a)(1)(i), and as long as it does not come within any statutory or regulatory exclusions, *see, e.g.*, 10 U.S.C. 1079(a);[2] 32 C.F.R. § 199.4(g). TRICARE regulations define care that is "medically or psychologically necessary" as "medical[3] services and supplies which represent appropriate medical care and that are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of illness, injury, pregnancy, and mental disorders." *See* 32 C.F.R. § 199.2(b); *see also id.* (definition of "appropriate medical care"). "Subject to all applicable definitions, conditions, limitations, or exclusions," the TRICARE Basic Program "will pay for medically necessary services and supplies required in the diagnosis or treatment of illness or injury, including maternity care and well-baby care." *See* 32 C.F.R. § 199.4(a)(1)(i).

Unproven drugs, devices, and medical treatments or procedures are not covered under the

---

[2] Plaintiffs' entire argument on the merits is focused on one of these statutory exclusions. *See* Pls.' Memorandum In Support of Motion for Preliminary Injunction (Dkt. #48) at 10 ("Plaintiffs' *motions* asks this Court to resolve a legal question of statutory interpretation - whether ABA therapy is 'special education' for purposes of 10 U.S.C. 1079(a)(9).").

[3] Medical is defined as pertaining to "the diagnosis and treatment of illness, injury, pregnancy, and mental disorders by trained and licensed or certified health professionals." *See* 32 C.F.R. § 199.2(b). The term "should be understood to include 'medical, psychological, surgical, and obstetrical.'" *See id.*

Basic Program.  *See* 32 C.F.R. § 199.4(g)((15).  For the medical service to be considered proven, it is necessary for "reliable evidence" to show that the "medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis."  *See* 32 C.F.R. § 199.4(g)((15)(i)(C).  "Reliable evidence" is restricted by regulation to the following enumerated categories of medical/scientific evidence:

    (i)      Well controlled studies of clinically meaningful endpoints, published in refereed medical literature.
    (ii)     Published formal technology assessments.
    (iii)    The published reports of national professional medical associations.
    (iv)    Published national medical policy organization positions; and
    (v)     The published reports of national expert opinion organizations.

*See* 32 C.F.R. § 199.2(b).[4]  "Specifically not included in the meaning of reliable evidence are reports, articles, or statements by providers or groups of providers containing only abstracts, anecdotal evidence or personal professional opinions."  *See id*.  Thus the DoD covers medically necessary care that meets regulatory requirements and that is not otherwise excluded by statute or other implementing regulations.

       If a contractor makes an initial determination that a beneficiary is not entitled to reimbursement, that determination is "final *unless* appealed in accordance with this chapter, *or unless the initial determination is reopened* by the TRICARE Management Activity, the [TRICARE] contractor, or the [TRICARE] peer review organization."  *See* 32 C.F.R. § 199.10(a)(1)(ii) (emphasis added).  A beneficiary could choose to seek reconsideration with a TRICARE contractor.  *See* 32 C.F.R. § 199.10(a)(8).  Should the beneficiary seek further review

---

       [4] "The hierarchy of reliable evidence of proven medical effectiveness, established by (1) through (5) of this paragraph, is the order of the relative weight to be given to any particular source."  *See id*.

beyond a reconsideration, then only at that time is the review made at the agency level by TMA.
*See id*.  A "formal review" of a reconsideration "is performed by the Chief, Office of Appeals
and Hearings, [TMA], or a designee, and is a thorough review of the case."  *See* 32 C.F.R. §
199.10(c)(2).  "Any party to the initial determination may request a hearing if the party is
dissatisfied with the formal review determination" and certain conditions, such as a monetary
minimum, apply.  *See*  32 C.F.R. § 199.10(d).  An "authorized party to any hearing, including
[TMA] may submit [at the hearing] additional evidence of testimony relevant to the appealable
issue(s) and may appoint a representative, including legal counsel, to participate in the hearing
process."  *See* 32 C.F.R. § 199.10(d)(2).

  A determination as to whether a medical treatment or medical care is a benefit covered
under the Basic Program, 32 C.F.R. § 199.4, is a separate consideration from whether something
is covered under an extended benefits program, 32 C.F.R. § 199.5, that was established by
Congress for dependents of active duty service members "to assist in the reduction of the
disabling effects of a qualifying condition," *see* 10 U.S.C. § 1079(d)(1).  This program, known as
TRICARE Extended Care Health Option ("ECHO"),[5] "is essentially a supplemental program to
the TRICARE Basic Program" and "does not provide acute care nor benefits available through

---

  [5] Pursuant to section 701(b) of the National Defense Authorization Act for Fiscal Year
2002, the ECHO program replaced the previous Program for Persons with Disabilities
("PFPWD").  *See Tricare; Individual Case Management Program; Program for Persons With
Disabilities; Extended Benefits for Disabled Family Members of Active Duty Service Members;
Custodial Care*, 69 Fed. Reg. 51559 (Aug. 20, 2004).  Congress established PPFWD, although it
was originally named Program for the Handicapped, "to provide financial assistance for active
duty family members who are moderately or severely mentally retarded or have a serious
physical disability" and "to help defray the cost of services not available either through the Basic
Program or through other public agencies as a result of state residency requirements."  *See id*. at
51560.  The switch to the ECHO program, among other things, added "an extraordinary physical
or psychological condition as a qualifying condition."  *See id*.

the TRICARE Basic Program." *See* 32 C.F.R. § 199.5(a)(1).  Rather, the "purpose of ECHO is

to provide an additional financial resource for an integrated set of services and supplies designed

to assist in the reduction of the disabling effects of the ECHO-eligible dependent's qualifying

condition." *See* 32 C.F.R. § 199.5(a)(2).  The Department of Defense has defined "qualifying

condition" to include (i) Mental Retardation; (ii) Serious physical disability; (iii) Extraordinary

physical or psychological condition; (iv) Neuromuscular developmental condition or other

condition for beneficiaries under the age of 3 years that is expected to precede a diagnosis of

moderate or severe mental retardation or a serious physical condition; and (v) Multiple

disabilities.  *See* 32 C.F.R. § 199.5(b)(2).  An ECHO benefit is an item or service that the

Director of TMA "has determined are capable of confirming, arresting, or reducing the severity

of the disabling effects of a qualifying condition."  *See* 32 C.F.R. § 199.5(c).  Extended benefits

for these qualifying dependents may include the provision of "[t]raining, rehabilitation, special

education, and assistive technology devices."  *See* 10 U.S.C. § 1079(e)(3)**.**

        The TRICARE statute is silent on whether ABA is covered under the Basic Program.

But "[t]he John Warner National Defense Authorization Act for Fiscal Year 2007, section 717,

required [DoD] to develop a plan to provide services to military-dependent children with autism

*within the authority of the ECHO program*.  Part of the plan was to develop a demonstration

project to expand the availability of [Intensive Behavioral Intervention ("IBI")] services."  *See*

Autism Services Demonstration Project for TRICARE Beneficiaries Under the Extended Care

Health Option Program, 72 Fed. Reg. 68130, 68131 (Dec. 4, 2007) (emphasis added).  TMA has

instituted a demonstration program for IBI services, which includes ABA services, for the

treatment of autism under ECHO for ABA therapy.  *See id*.  The demonstration program

expanded the list of providers who would be eligible for reimbursement under ECHO.[6]  *See id.* at

68132 ("This demonstration will test the advisability and feasibility of permitting TRICARE

reimbursement for IBI services delivered by non-professional providers, under a modified

corporate services model, in the absence of state or industry oversight.  Neither the TRICARE

Basic Program nor the ECHO program currently authorizes reimbursement for providers

working within this type of unregulated corporate structure.").

## II.     Procedural and Factual Background

This APA action arises out of a June 18, 2007, denial of reimbursement for ABA

treatment for plaintiffs' dependent's autism by a contractor of TMA.  *See* Plaintiffs' Complaint,

Ex. 1 (attached hereto as Exhibit 2).[7]  In denying plaintiffs' request for reconsideration of the

earlier denial of reimbursement for ABA, TMA's contractor stated that "ABA therapy cannot be

authorized unless the beneficiary is enrolled in the ECHO program."  *See id.* at 3.  The contractor

thus denied authorization for the "requested ABA therapy services" because "the sponsor is

retired and therefore the beneficiary is not eligible for the ECHO program."  *See id.*  The

decision, however, never addressed whether ABA is covered under the Basic Program.  The

plaintiffs never sought further review of that decision made at the contractor level and, thus,

TMA did not have the opportunity to address the plaintiffs' (the Berges') claim.

Instead of proceeding administratively, plaintiffs waited almost three years and then filed

---

[6] Since 2001, predating this demonstration program, TMA has provided for reimbursement for ABA under its extended benefits program.  *See* Defendants' Unopposed Motion to Supplement the Record In Support of Defendants' Motion to Dismiss Or, In the Alternative, To Hold This Action in Abeyance (Dkt. #14)

[7] Plaintiffs' exhibit cut off the last couple of pages of the letter that identified the Plaintiffs' appeal rights.  The full document is attached to this memorandum.

this putative class action on March 5, 2010.  *See* Dkt. #1.  Although they filed the complaint in

early March, plaintiffs waited more than six weeks to serve the complaint.  *See* Dkt. #4.

Plaintiffs delayed service as they considered whether to seek another forum due to a purported

"concern about a backlog in the D.C. District Court," but, "[a]fter considering their options,

Plaintiffs decided to move forward in this Court."  *See* Pls. Opp. To Defs.' Motion for Ext. Of

Time (Dkt. #51) at 3.

     In their complaint, plaintiffs allege that "TMA has adopted an arbitrary and capricious

policy that ABA therapy is 'special education' and is, therefore, excluded from coverage under

[10 U.S.C. § 1079(a)(9)]," and that, as a result, "TMA denies claims for reimbursement of ABA

therapy under the Basic military health care benefits program."  *See* Plaintiffs' Compl. ¶20.

They also allege that this purported "policy was not subjected to public notice and comment"

and "was not published in the Federal Register."  *See id*. ¶21.  Plaintiffs, however, concede that

they "cannot find that policy in any publicly available writing of the DoD."  *See id*.

     The government has moved to dismiss this action or, in the alternative, to hold this action

in abeyance pending a final decision on the grounds that there is no final agency action to

review.  *See* Dkt. #12.  Having concluded that it never made a formal policy determination as to

whether ABA is covered under the Basic Program, TMA reopened the initial determination

denying plaintiffs' claim for reimbursement for ABA.  *See* TMA Reopening of the Denial of

Z.B.'s ABA Claim, attached as Attachment B to Defendants' Memorandum in Support of Their

Motion to Dismiss Or, In the Alternative, to Hold This Action in Abeyance (Dkt. #12-2) ("TMA

Reopening Letter") (attached hereto as Exhibit 3).  Rather, since 2001, TMA has considered

ABA to be covered under its extended benefits program, and correspondingly not covered under

the Basic Program.  *See* Defendants' Unopposed Motion to Supplement the Record In Support of

Defendants' Motion to Dismiss Or, In the Alternative, To Hold This Action in Abeyance (Dkt. #14). Now, TMA is seeking to make a determination through the adjudication of plaintiffs' claim as to whether ABA is covered under the Basic Program. *See* TMA Reopening Letter.

In making the revised initial determination, the TMA Appeals office will consider the recommendation made by TMA's Medical Benefits and Reimbursements Branch ("MB&RB"), and "the position" of TMA's Medical Director. *See id*. at 1. The Appeals office will also consider "any information the Berges wish to submit." *See id*. at 2. If ABA is determined to be a covered benefit, then the TMA Appeals office will make a series of individualized assessments for the Berges, "as is done for every TRICARE claim, [of] whether the provider is an authorized provider and whether the treatment is medically necessary for" the Berges' dependent's particular condition. *See id*.

In the meantime, TMA vacated any previous instruction it may have issued to its contractors as to whether ABA is covered under the Basic Program: "Any prior instructions related to the coverage or non-coverage of ABA under the Basic Program are cancelled and are no longer operative." *See* Defendants' Unopposed Motion to Supplement the Record In Support of Defendants' Motion to Dismiss Or, In the Alternative, To Hold This Action in Abeyance, Exhibit 3 (Dkt. #14-3) (attached hereto as Exhibit 4) (emphasis added).[8] While the review of whether ABA is covered under the Basic Program is being completed, TMA instructed its contractors that any "requests for authorization for ABA under the Basic Program should be held in abeyance pending completion of the review." *See id*.[9]

_____

[8] TMA continues to cover ABA under ECHO. *See id*.

[9] Plaintiffs attach two denials for reimbursement for ABA under the Basic Program from a contractor that post-dated this instruction to the contractors. *See* Plaintiffs' Memorandum In

In addressing plaintiffs' adjudication, TMA asked "plaintiffs to submit any additional evidence they want TMA to consider by July 30, 2010," so as to be able to issue a decision on plaintiffs' claim for reimbursement no later than September 20, 2010. *See* TMA Reopening Letter (Exhibit 3). "Under a July 29, 2010, letter," plaintiffs, through counsel, "submitted voluminous documentation" to support their "position that ABA therapy should be covered as medical treatment." *See* Declaration of Donnie O. Woody ¶ 7 (Exhibit 5). After reviewing this initial submission, TMA gave plaintiffs an additional opportunity to submit documentation that plaintiffs considered met the "reliable evidence" standard. *See id.* Plaintiffs sent another voluminous set of materials that were received by TMA on August 31, 2010. *See id.* "All documentation has been referred to MB&RB."[10] *See id.* ¶ 8.

TMA is seeking to ensure that its review is thorough. In particular, TMA ordered copies of the more than fifty articles referenced in a purported expert report by plaintiffs even though plaintiffs did not provide those articles to TMA. *See id.* ¶ 7. In needing to review all of plaintiffs' submissions, much of which were not received until August 31, 2010, and any other materials warranting consideration, "the original completion date of September 20, 2010, is not feasible." *See id.* ¶ 8. After the MB&RB completes its review, it will forward its recommendation to the Office of the Chief Medical Officer ("OCMO") for concurrence. *See id.* The matter will then be sent to the Director of TMA for the issuance of a formal agency position

Support of a Motion for Preliminary Injunctions, Exhibits 34, 35. That, however, does not negate that TMA issued an instruction to its contractors to stay all claims. Whether a particular contractor did or did not improperly deny an individual claim following such an instruction is not the subject of this litigation and has no effect on plaintiffs' claim for reimbursement.

[10] "In cases involving a question as to whether the care is proven, the case is usually referred to the TMA Medical Benefits and Reimbursement Branch (MB&RB) for review." *See* Woody Decl. ¶ 3.

on ABA coverage. *See id.* Upon completion of that review, TMA Appeals and Hearings expects to issue a decision on plaintiffs' claim for reimbursement no later than November 3, 2010. *See id.*

While the administrative proceeding has been ongoing, plaintiffs have filed several motions in this Court in an attempt to short-circuit the ongoing administrative process. They have sought this Court to certify a class, compel production of an administrative record, vacate any purported TMA policy that ABA is not covered under the Basic Program, enter summary judgment for plaintiffs that ABA is not excluded under the Basic Program as "special education," and schedule remaining briefing and consideration of class certification. *See* Dkt. #s 6, 19, 20, 35, 41, 54. The government has either opposed or sought a stay of consideration of each of these motions; it would be premature for this Court to enter these orders when there has been no final agency action for this Court to review; even if plaintiffs were to prevail, the further investigation and explanation that TMA is presently doing would be the only appropriate remedy available to plaintiffs. Plaintiffs' present motion for a preliminary injunction again attempts to have this Court order TMA to provide for reimbursement for ABA therapy before the completion of the administrative process. *See* Dkt. #48. In doing so, plaintiffs are also seeking to improperly inquire into the agency decision-making process by seeking the live testimony of a flagged-military officer during this Court's hearing on plaintiffs' motion for a preliminary injunction. *See* Exhibit 1 (subpoena of Admiral Hunter); Defendants' Motion to Quash Subpoena of Admiral Hunter (Dkt. #56).

## ARGUMENT

### I.    Standards for Issuance of a Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as

of right." *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008) (citation omitted) (internal quotation

marks omitted); *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The

power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly

exercised.'").  For a plaintiff to prevail on a motion for preliminary relief, the plaintiff must

demonstrate: (1) a substantial likelihood of success on the merits; (2) that it would suffer

irreparable injury if the injunction is not granted; (3) that an injunction would not substantially

injure other interested (nonmoving) parties; and (4) that the public interest would be furthered by

the injunction. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir.

1995); *see also, e.g., Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841,

842–43 (D.C. Cir. 1977); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921,

925 (D.C. Cir. 1958).  The plaintiff must satisfy each of these four factors separately, and the

court must further find that these four factors together justify the drastic intervention of a

preliminary injunction.  *See CityFed Fin. Corp.*, 58 F.3d at 747; *Chaplaincy of Full Gospel

Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006).  Moreover, if a plaintiff has little

likelihood of succeeding on the merits of its claim, the court need not address the other

preliminary injunction factors.  *Apotex, Inc. v. FDA.*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006);

*CityFed Fin. Corp.*, 58 F.3d at 746 (requiring the moving party to "demonstrate . . . a substantial

likelihood of success on the merits"); *City of Las Vegas v. Lujan*, 891 F.2d 927, 935 (D.C. Cir.

1989) (affirming district court's denial of preliminary injunction without addressing irreparable

injury because appellant had insufficient likelihood of success on the merits).

When a party is seeking a mandatory injunction that would alter the status quo rather

than preserve it, "'the moving party must meet a higher standard than in the ordinary case by

showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage will

result from the denial of the injunction.'" *See Nat'l Conf. On Ministry to Armed Forces v. James*,

278 F.Supp.2d 37, 43 (D.D.C. 2003) (quoting *Columbia Hosp. for Women Foundation, Inc. v.*

*Bank of Tokyo-Misubishi, Ltd.*, 15 F.Supp.2d 1, 4 (D.D.C. 1997) (denying a motion for a

mandatory preliminary injunction even though the balance of equities favored the plaintiffs),

*aff'd*, 159 F.3d 636, 1998 WL 203110 (D.C. Cir. 1998) (quoting *Phillip v. Fairfield Univ*., 118

F.3d 131, 133 (2nd Cir. 1997).  "A district court should not issue a mandatory preliminary

injunction unless the facts and law clearly favor the moving party."  *See Columbia Hosp. for*

*Women Foundation, Inc. v. Bank of Tokyo-Misubishi, Ltd.*, 15 F.Supp.2d at 4 (quotations and

citations omitted); *see also* Plaintiffs Memorandum in Support of Motion for Preliminary

Injunction ("Pls. Mem. In Support of Motion for Prelim. Inj.") at 5 (acknowledging that

"mandatory injunctions must generally show a greater harm and likelihood of success than

orders restraining action").

## II.    Plaintiffs' Have No Likelihood of Success on the Merits.

### A.    This Case Must Be Dismissed for Lack of Final Agency Action.

This Court can dispose of this motion because there is no final agency action for this

Court to review.  Here, plaintiffs cannot establish they are challenging a final agency action.  On

this basis, defendants have moved to dismiss this action or, at the very least, hold this action in

abeyance pending a final agency decision.  *See* Defendants' Motion to Dismiss Or, In the

Alternative, to Hold This Action in Abeyance (Dkt. #12); *See* Defendants' Unopposed Motion to

Supplement the Record In Support of Defendants' Motion to Dismiss Or, In the Alternative, To

Hold This Action in Abeyance (Dkt. #14); Defendants' Reply to Plaintiffs' Memorandum In

Opposition To Defendants' Motion To Dismiss Or, In The Alternative, To Hold This Action In

Abeyance (Dkt. #31).

When a plaintiff seeks a preliminary injunction in an action brought under the APA, it is particularly important that the movant shows a "likelihood of success in proving" that the agency's actions were "arbitrary, capricious, or contrary to law." *See Nat'l Conf. On Ministry v. James*, 278 F.Supp.2d at 44-45. "[A]bsent a substantial indication of the likely success on the merits, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *See id.* (quoting *Adair v. England*, 217 F.Supp.2d 1, 4 (D.D.C. 2002) (internal quotations omitted). "The APA authorizes review only with respect to a 'final agency action.'" *See King v. Leavitt*, 475 F.Supp.2d 67, 71 (2007) (citing 5 U.S.C. § 704 and *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("The District Court's authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action'")).  If a plaintiff cannot establish that they are challenging a final agency action, they cannot demonstrate a likelihood of success on the merits for purposes of a preliminary injunction.  *See King v. Leavitt*, 475 F.Supp.2d at 72 (granting motion to dismiss for lack of final agency action and, correspondingly, denying motion for a preliminary injunction).

By federal regulation, there has been no final agency action.  An initial determination for a claim for reimbursement under TRICARE is final unless, among other reasons, "the initial determination is reopened by [TMA]."  *See* 32 C.F.R. § 199.10(a)(1)(ii)(A).  In a letter dated June 22, 2010, TMA reopened the initial determination that is at issue in this action.  *See* TMA Reopening Letter ("The matter is reopened in accordance with 32 C.F.R. 199.10(a)(1)(ii)").

Although plaintiffs try to manufacture a dispute for this Court to review, TMA does not have a policy or rule that ABA therapy is excluded from the Basic Program.  Rather, TMA is seeking to a make a determination at this time through the reopening of the adjudication of

plaintiffs' claim as to whether ABA is covered under the Basic Program. *See* TMA Reopening

Letter (Exhibit 3); Woody Decl (Exhibit 5). In fact, TMA has vacated any previous instruction

that it may have issued to its contractors that ABA is not covered under the Basic Program and

has requested that its contractors stay all claims for ABA coverage under the Basic Program

pending completion of its review as to "whether [ABA] is a covered benefit." *See* June 30,

2010, Notification Regarding Applied Behavior Analysis, (Exhibit 4). Thus, it is an open

question as to whether plaintiffs are entitled to reimbursement for their dependent's ABA

therapy.

     Final agency action requires both that (1) "the action must mark the consummation of the

agency's decisionmaking process" and (2) "the action must be one by which rights or obligations

have been determined or from which legal consequences will flow." *See Appalachian Power

Company v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (citations and internal quotations

omitted). In their opposition to defendants' motion to dismiss, plaintiffs tried to analogize to the

finding in *Appalachian Power* that the Environmental Protection Agency's ("EPA's") Guidance

was still final even though it was subject to change. *See* Pls. Opp. To Defs.' Motion to Dismiss

(Dkt. #22) at 21. But that is very different from what is happening in this case. In that case, the

Court found the EPA's Guidance to constitute final agency action because it "reflect[ed] a settled

agency position." *See Appalachian Power*, 208 F.3d at 1023. Here, the entire point is that there

is not a settled agency position as to whether ABA is covered under the Basic Program and

whether plaintiffs are entitled to reimbursement.

     The agency has neither consummated its decisionmaking process nor has plaintiffs' right

to reimbursement for ABA therapy been determined. Accordingly, it would be premature for

this Court to entangle itself in this debate when TMA has not issued a reviewable decision. *Cf.*

*Abbott Laboratories v. Gardner*, 387 U.S. 148-49 (1967) (the basic premise of the ripeness

doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements over administrative policies, and also to protect the

agencies from judicial interference until an administrative decision has been formalized and its

effects felt in a concrete way by the challenging parties."), *overruled on other grounds*, *Califano

v. Sanders*, 430 U.S. 99 (1977); *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer

Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) ("The interest in postponing review is

powerful when the agency position is tentative.  Judicial review at that stage improperly intrudes

into the agency's decisionmaking process.  It also squanders judicial resources since the

challenging party still enjoys an opportunity to convince the agency to change its mind")

(quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986)).

      Plaintiffs can show no likelihood of success on the merits that would warrant bypassing

the ongoing administrative process when the agency has not reached a final decision on the

underlying matters in this litigation.  Even if plaintiffs were ultimately to prevail in this action,

they would not be entitled to the relief that they seek in this preliminary injunction.  Rather, a

"reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being

reviewed" but should, when necessary, "remand to the agency for additional investigation or

explanation."  *See Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985).  That is exactly

the process that the agency is undergoing.  The agency is nearing the completion of its review.

And, if the plaintiffs are dissatisfied with the outcome, they would have an opportunity to

challenge the agency's position by seeking a hearing.  *See*  32 C.F.R. § 199.10(d).

**B.    This Court Should Not Entertain Plaintiffs' Attempt to Prematurely Reach the Merits.**

Plaintiffs claim that "Defendants have refused to even address this case on the merits, opting instead to strictly pursue a strategy of 'stay and delay.'" *See* Pls.' Mem. In Support of Motion for Prelim. Inj. at 11.  But given that there had been no final agency action for this Court to review, there are no merits for this Court to address.  *See* Defendants' Motion for Stay of Further Proceedings on Plaintiffs' Motion for Summary Judgment (Dkt. #42).

It would be premature for this Court to opine on plaintiffs' arguments set forth in both their motion for summary judgment and this motion for a preliminary injunction that ABA is not statutorily excluded from the Basic Program as "special education" for purposes of 10 U.S.C. § 1079(a)(9).  *See* Pls.' Mem. In Support of Motion for Prelim. Inj. at 10 ("Plaintiffs' *motions* asks this Court to resolve a legal question of statutory interpretation - whether ABA therapy is 'special education' for purposes of 10 U.S.C. 1079(a)(9).") (emphasis added); *see also id*. at 21-43.  There is no ongoing policy that ABA is excluded from the Basic Program as "special education."  Rather, TMA is in the process of making the ultimate determination as to whether ABA is covered under the Basic Program.[11]

_____

[11] Although the federal register notice implementing the demonstration program for Intensive Behavioral Intervention ("IBI") services under ECHO refers to IBI as "special education," the notice is confined to whether IBI, including ABA, can be cost-shared under ECHO.  *See* 72 Fed. Reg. 68130 ("Under ECHO, qualifying Active Duty family members may receive benefits not available under the basic program.  For example, special education services are specifically excluded from the TRICARE basic program under 10 U.S.C. 1079(a)(9) . . . . IBI, as a behavioral intervention that shapes behaviors and teaches skills, is a special education service that can be cost-shared under ECHO.").  For several years TMA considered ABA to be covered under ECHO and, correspondingly, not covered under the Basic Program, but, again, it is now an open question as to whether ABA is covered under the Basic Program that TMA is in the process of resolving.  *See* Defendants' Unopposed Motion to Supplement the Record In Support of Defendants' Motion to Dismiss Or, In the Alternative, To Hold This Action in Abeyance (Dkt. #14).  TMA has never made a formal policy determination as to whether ABA is

- 19 -

It would be an academic exercise for this Court to address the question of whether ABA is statutorily excluded from the Basic Program as "special education" when TMA may ultimately determine in less than six weeks that ABA is not statutorily excluded under the Basic Program as "special education" for purposes of 10 U.S.C. § 1079(a)(9).  *See* TMA Reopening Letter (Exhibit 3) ("TMA will address whether ABA is a covered medical treatment; this review will also address whether it is education, special education, or a type of training").  In any event, even if this Court were to determine that ABA is not statutorily excluded as such, that does not mean that plaintiffs would be entitled to the relief they seek of having all ABA therapy covered under the Basic Program.  *See* Defendants' Motion for Stay of Further Proceedings on Plaintiffs' Motion for Summary Judgment at 4 ("To conclude that something is covered under the Basic Program, there still needs to be a determination based on reliable evidence that ABA is, *inter alia*, 'medically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction.'") (quoting 10 U.S.C. § 1079(a)(13)); 32 C.F.R. § 199.2 (definitions of "medical," "medically or psychologically necessary," and "appropriate medical care"); 32 C.F.R. § 199.4 (g) (exclusions and limitations for coverage under the Basic Program).

Further, it is inappropriate for this Court to look beyond the administrative record to resolve plaintiffs' APA claims.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").  Plaintiffs acknowledge that their submissions to this Court are extra-record evidence, claiming that this is because the government has "refuse[d] to

---

covered under the Basic Program.  *See* TMA Reopening Letter (Exhibit 3).  In now making that determination, TMA is reviewing the recent medical literature to determine if ABA is a proven medical modality under the regulatory "reliable evidence" standard.  *See id.*; Woody Decl. ¶¶ 4,6,7.

produce the administrative record." *See* Pls. Mem. In Support of Motion for Prelim. Inj. at 10.

No administrative record has been produced because there has been no final agency action for

which an administrative record exists. *See* Defendants' Opposition to Plaintiffs' Motion to

Compel Production of the Administrative Record (Dkt. #32) at 1 ("At this time, there is no

administrative record to provide of the action that is being subject to judicial scrutiny.").  Should

the agency's forthcoming decision on the adjudication of plaintiffs' claim for reimbursement

ever be the subject of judicial review, then an administrative record of that decision would be

produced.

   This Court should reject plaintiffs' attempt to have this Court reach a decision based on

extra-record evidence that ABA is accepted appropriate medical care covered under the

TRICARE Basic Program.  Under the APA, TMA should first having an opportunity to exercise

its expertise in making its own determination based on a detailed factual inquiry of recent

medical literature  *See Smith v. Office of Civilian Health & Med. Program*, 97 F.3d 950, 957 (7th

Cir. 1996) (holding a decision by CHAMPUS, now known as TRICARE, to treat a certain

therapy "as still experimental" as not "arbitrary, for it entails the very judgment call Congress

has assigned to the administrative agencies.").  Indeed, plaintiffs do not even address the

regulatory "reliable evidence" standard that must be met to show a treatment is a proven medical

modality.  *See* 32 C.F.R. § 199.2(b) (definition of "reliable evidence").  Rather, they ask this

Court to accept it as a given that ABA is a proven medical modality for the treatment of autism.

*See* Pls.' Mem. In Support of Motion for Prelim. Inj. at 20 ("ABA therapy is medically necessary

health care that is proven safe and effective and considered the standard of care in the United

States").  In fact, their entire statutory interpretation argument relies on that assumption.  *See id*.

at 24 (arguing that because "ABA therapy unquestionably *is* medically necessary, ABA therapy

cannot be [statutorily excluded as] 'special education.'") (emphasis in original).[12]  But this Court

cannot accept plaintiffs' extra-record materials as "reliable evidence" when they rely on

materials that do not meet the regulatory definition.  *Compare, e.g.,* Pls. Mem. In Support of

Prelim. Inj. at 27 (relying on opinion of purported expert) *with*  32 C.F.R. § 199.2(b)

("Specifically not included in the meaning of reliable evidence are reports, articles, or statements

by providers or groups of providers containing only abstracts, anecdotal evidence or personal

professional opinions.").

     Until TMA makes a final decision, this Court would only be left substituting its judgment

for that of the agency.  *See Smith*, 97. F.3d at 955 ("Where Congress has authorized an agency to

promulgate criteria for dispersing benefits and to interpret those criteria, a reviewing court must

guard against substituting its own judgment for that of the agency.").  In *Smith,* the Seventh

Circuit held that although it "sincerely hope[d] [the therapy at issue] proves the cure so many

desperately seek," it could not "substitute [its] hopes for [TRICARE's] considered judgment."

*See id.* at 961.  In the end, the therapy in *Smith* proved unsustainable:

---

[12] Plaintiffs devote much of their brief to arguing that it "is crystal clear that Congress did not intend the words 'special education' in the section 1079(a)(9) 'special education exclusion' to include within its ambit a medically and psychologically necessary, intensive, enormously detailed and nuanced psychotherapeutic intervention like ABA therapy, which is designed, supervised, and performed by highly trained and skilled ABA therapy and professionals and not by special education professionals."  *See* Pls. Mem. In Support of Motion for Prelim. Inj. at 11 ("Defendants are not entitled to *Chevron* deference."); *See also id.* at 10-43.  But this Court should reject plaintiffs' invitation to prematurely opine on the nature of ABA and its efficacy based upon extra-record evidence before the agency has an opportunity to render its decision. *See, e.g., id.* at 35 ("ABA therapy is 'the process of applying interventions that are based on the principles of learning derived from experimental psychology research to **systematically change behavior** and to demonstrate that the interventions are responsible for the observable improvement in behavior.'") (quoting *Dr. Plauche Johnson et al., "Pediatrics: Management of Children Autism Spectrum Disorders,"* available at http://pediatrics.aappublications.org/cgi/content/full/120/5/1162) (link provided by plaintiffs unavailable) (emphasis in original).

> In the late 1980s and 1990s, thousands of women elected to undergo high-dose chemotherapy with autologous bone marrow transplant (HDC-ABMT) as a last-chance treatment for breast cancer, despite the fact that the procedure cost upwards of $100,000 and was also expensive in terms of risks and side effects. When their health insurers refused to cover the treatment, many women sought payment through the judicial system. The result was a series of nearly a hundred courtroom battles, not to mention thousands of settlement negotiations, in which judges and juries were forced to determine whether women would have access to a new procedure that offered their only hope for survival. Without it they would almost certainly die. By the time studies were published conclusively showing that the procedure was ineffective, more than 30,000 women had already received the treatment, which often shortened their lives and added to their suffering, at a total cost of approximately $3 billion.

*See* 52 Wayne Law Review 43, 44-45 (2006).

With the administrative process not having yet been completed, plaintiffs cannot show that they are "clearly" entitled to have ABA therapy covered under the Basic Program to justify the extraordinary relief that they seek in this case. *See Nat'l Conf. On Ministry v. James*, 278 F.Supp.2d at 43.

### C.    It Would Be Inappropriate For This Court to Issue A Class-Wide Preliminary Injunction Without Certifying a Class.

Plaintiffs also cannot demonstrate a likelihood of success on the merits that they are entitled to class relief at this stage of the litigation. *See* Pls. Mem. In Support of Motion for Prelim. Inj. at 4 ("Pending a final disposition of this case, Defendants should immediately begin paying claims for ABA therapy under the TRICARE Basic Program."). As an initial matter, this Court has already stayed consideration of class certification.[13] *See* Minute Order, June 22, 2010.

Further, it is a general rule that district courts may not extend injunctive relief to nonparties where no class has been certified, except in the narrow circumstances where that

---

[13] Plaintiffs have moved to schedule further briefing on the matter. *See* Dkt. #41. They have also sought to have this Court consider class consideration as part of the preliminary injunction hearing. *See* Dkt. #54.

relief is incidently necessary to give the named parties a complete remedy.  *See Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (holding that, in the absence of class certification, preliminary injunctive relief may cover only the named plaintiffs).  Plaintiffs' reliance on *Williams v. San Francisco Unified School Dist.*, 340 F.Supp. 438 (N.D. Cal. 1972) and the Newberg treatise for the proposition that "it is appropriate for the Court to assume class status for this motion and to issue a class-wide injunction" is misplaced.  *See* Pls.' Mem. In Support of Motion for Prelim. Inj. at 6 (citing Newberg 4th ed, 2002, sec 7:2, p. 4).  First, the *Williams* decision pre-dated the Ninth Circuit's opinion in *Zepeda*.   Second, Newberg does not stand for the proposition that plaintiffs are entitled to class relief absent class certification.  Newberg merely states that some courts have considered class status in balancing equities when deciding a preliminary injunction.   *See* Newberg 4th ed, 2002, sec 7:2, p. 4 ("Not infrequently, the court will assume class status *for the purpose of conducting balancing tests* in preliminary or permanent injunction determinations, though *it has not issued a formal class ruling*.") (emphasis added).

Here, it would be particularly inappropriate to order defendants to make all payments for ABA therapy under the Basic Program when, even if ABA is covered under the Basic Program, there would still need to be individualized determinations as to whether the provider of the service or treatment is an authorized provider and whether the service or treatment is medically necessary for the individual.  *See* TMA Reopening Letter (Exhibit 3).

**III.    Plaintiffs Are Not Likely to Suffer Irreparable Harm By Having the Agency Complete the Administrative Review Process.**

The Supreme Court recently reaffirmed that a plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *See Winter v.*

*Natural Resources Defense Council*, 129 S.Ct. 365, 375 (2008) (emphasis in original). "Issuing

a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our

characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *See id*. at 375-376. As an initial

matter, plaintiffs' delay in seeking "emergency" injunctive relief undermines any credible

suggestion of irreparable injury. Further, plaintiffs cannot show a likelihood of an irreparable

injury in not being reimbursed for what they deem to be full coverage of ABA therapy as the

agency completes its review.

Delay is a relevant factor when considering whether a plaintiff has met his burden to

show irreparable injury. *Citybank, N.A. v. Citytrust & Citytrust Bancorp*, 756 F.2d 273, 276 (2d

Cir. 1985). Delays of as little as thirty to forty-five days before bringing suit have been deemed

fatal to the irreparable injury requirement. *See, e.g., Newdow v. Bush*, 355 F. Supp. 2d 265, 292

(D.D.C. 2005) (one-month "delay implies a lack of urgency and irreparable harm"); *see also

Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (forty-four day delay from

issuance of challenged regulations).

Plaintiffs have delayed in bringing this motion for a preliminary injunction and have

taken additional time to submit materials for TMA to review in the ongoing administrative

proceedings. Plaintiffs waited almost six months from the filing of the complaint to file this

motion for a preliminary injunction. *Compare* Compl. (Dkt. #1) (March 5, 2010) *with* Pls.'

Motion for Prelim. Inj. (Dkt. #48) (September 2, 2010). They even delayed in initiating this

litigation, waiting six weeks to serve the complaint so as to "consider[] their options" after

plaintiffs' attorneys became "concern[ed] about a backlog in the D.C. District Court caused by

four Judicial Vacancies." *See* Pls. Opp. To Defs.' Motion for Extension of Time to Respond to

Pls.' Motion for a Prelim. Inj. (Dkt. #51).  Now, shortly before the agency is to reach a decision, plaintiffs file this motion for preliminary injunction that "essentially seek[s] the same relief that [plaintiffs] requested in their underlying complaint, i.e., payment for Applied Behavior Analysis therapy under the TRICARE Basic Program for all beneficiaries under the program who suffer from autism, . . . albeit now on an expedited basis."  *See* Order, September 9, 2010 (Dkt. #52).

Plaintiffs also delayed in providing materials to TMA during the administrative proceedings, with their latest submission to TMA being only three days before they filed this motion for a preliminary injunction.  In order for TMA to complete its review by September 20, 2010, the originally anticipated completion date, TMA requested plaintiffs "to submit any additional evidence they want TMA to consider by July 30, 2010."  *See* TMA Reopening Letter (Exhibit 3).  Although plaintiffs, through counsel, submitted voluminous documentation for TMA consideration in a July 29, 2010, submission, TMA sought to ensure whether plaintiffs intended to submit any additional materials consistent with the regulatory standards for "reliable evidence."  *See* Woody Decl. (Exhibit 5) ¶ 7.  After initially representing that they would send materials by August 23, 2010, plaintiffs sent additional documentation in a letter dated August 30, 2010, which was received by TMA on August 31, 2010.  *See id*.  Plaintiffs filed this motion for a preliminary injunction on September 2, 2010.  *See* Dkt. #48.  This additional package of materials contained a declaration with a bibliography of more than 50 articles, five additional articles from medical journals, and a 36-page report, with five appendices, published by the National Autism Center.  *See* Woody Decl. ¶ 7.  To do a thorough review of these additional materials submitted one-month after the original deadline,  TMA now anticipates issuing a decision adjudicating plaintiffs' claim for reimbursement no later than November 3, 2010.  *See id*. ¶¶ 7, 8.  Given that plaintiffs appear to have made their final document submission, TMA

does not anticipate revising its completion date absent unforeseen circumstances. *See id*. ¶ 8.

Plaintiffs cannot show that they are likely to suffer irreparable harm by waiting for the administrative process to be completed by November 3, 2010. The agency's review of whether ABA is covered under the Basic Program will be completed before the agency would be able to process guidance for implementing any Court order requiring payment of ABA; it would take TMA approximately 120 days to institute any guidance needed for processing claims for ABA under the Basic Program if ordered to do so. *See* Declaration of Michael O'Bar (Exhibit 6) ¶ 6c.[14]  And, neither plaintiffs nor any other beneficiary could assume that they would be entitled to reimbursement even if it was ordered that ABA is covered under the Basic Program. *See* TMA Reopening Letter (Exhibit 3) (individual assessments would be needed regarding "whether the provider is an authorized provider and whether the treatment is medically necessary for" the beneficiary's particular condition); O'Bar (Exhibit 6) ¶ 6d ("because the Basic Program is limited to the provision of services by authorized providers as defined by 32 C.F.R. § 199.6, there is a potential of a number of individuals expending resources on ABA therapy administered by non-authorized providers and then not being eligible for reimbursement")

---

[14] "If TMA were ordered to provide ABA as a benefit under the Basic Program before its review was completed, the agency and its [health care support contractors ("HCSCs")] would need to take many actions that would impact the TRICARE program and its beneficiaries:

. . .

    c. Third, TMA would be required to direct its HCSCs to make changes to the automated claims processing systems. The HCSCs subcontract with claims processors to pay TRICARE claims. As what the systems show as a covered benefit would be changed to include ABA as a Basic Program benefit, this information would be required to be programmed into the claims processing system. It is estimated that it would take TMA approximately sixty days to design and publish the guidance needed for the HCSCs and claims processing subcontractors. Further, it is estimated that it would take the HCSCs and claims processing subcontractors approximately sixty additional days to implement this new guidance."

*See id*.

Further, plaintiffs' claim may ultimately be a monetary claim and it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *See Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs acknowledge that they have paid $20,000 a year for their dependent to receive twelve hours of ABA therapy a week, but they claim their dependent is suffering irreparable harm in not getting the recommended minimum 25 hours a week. *See* Berge Affidavit., Ex. 2 to Pls. Motion for Prelim. Inj., ¶¶ 15, 16, 19. Paying $20,000 a year for twelve hours a week results in approximately $32 per hour over the course of 52 weeks. Thus, for plaintiffs to pay for an additional 13 hours a week for the next six weeks, it would cost them approximately $2,500. Plaintiffs' declaration does not address their ability to cover this additional cost.[15] Moreover, if plaintiffs ultimately prevail in their administrative claim, then they can also seek reimbursement for any of the monies that they spent on ABA therapy while awaiting a decision.

Finally, in contending that there is irreparable harm, plaintiffs rely on declarations form other TRICARE beneficiaries. But there may be individuals of the putative class who can afford to pay for ABA therapy such that their claims against TRICARE are purely monetary. Or there may be others who have other opportunities outside of TRICARE to have ABA covered; TMA merely provides for specified reimbursement for medical services, but does not provide the direct services. For example, plaintiffs rely on *Malkentzos v. DeBuono*, 923 F.Supp. 505, 515 (S.D.N.Y. 1996), for the proposition that plaintiffs would suffer irreparable harm if not provided

---

[15] In opposing the posting of a bond, plaintiffs state that "military families are already financially extended" and "cannot afford to pay for ABA therapy." *See* Pls. Mem. In Support of Prelim. Inj. at 44. Defendants do not dispute that some military families are financially extended but that is a separate question from whether plaintiffs can afford the additional $2,500 or whether they have others sources of funding for ABA therapy other than TRICARE.

ABA therapy.  *See* Pls. Mem. In Support of Prelim. Inj. at 6.  But that case concerned whether

the State of New York must provide reimbursement for ABA under the Individuals with

Disabilities Education Act ("IDEA").  *See Malkentzos v. DeBuono*, 923 F.Supp. 505.

Individuals who receive ABA therapy under the IDEA cannot allege that they are suffering any

irreparable harm by not having TRICARE reimburse them for the same very care.  In addition,

as described above, it would take more time to implement the claims processing guidance to

cover ABA under the Basic Program than it will take for TMA to complete its review.  *See*

O'Bar Decl. ¶ 6c (Exhibit 6).  Accordingly, neither plaintiffs nor the unnamed class members

can show a likelihood of irreparable harm in having the agency first complete its review as to

whether ABA is covered under the Basic Program.

**IV.   Issuance of a preliminary injunction would harm the defendants and is contrary to the public interest.**

Plaintiffs do not even attempt to establish that the government or others will not be

harmed by the issuance of an injunction; indeed, plaintiffs ignore several substantial harms to

TRICARE, its beneficiaries, and the public that counsel against issuance of an injunction.

Issuance of preliminary relief in this case would work a number of distinct harms.  The

injunction sought by plaintiffs could cause a significant impact on TRICARE beneficiaries who

are currently eligible to receive reimbursement for ABA under ECHO.  "[T]here is a limited

number of [Board Certified Behavior Analyst] professional providers authorized to provide ABA

services" and "[e]xtending the coverage of those services to non-active duty dependents through

the Basic Program may limit access to ABA services for active duty service dependents who are

now eligible to receive ABA services under ECHO."  *See* O'Bar Decl. ¶ 6d (Exhibit 6).

Further, if the Court's order required TRICARE to cover all ABA therapy before there

has been a decision as to whether ABA is covered under the Basic Program, then DoD, and ultimately the taxpayer, would incur costs for reimbursing ABA therapy when it may ultimately be determined that those are costs that should never have been incurred.  *See id.* ¶ 6a ("it is estimated that it would cost TRICARE an additional $56,500,000 per year to cover ABA under the Basic Program" and "TMA has not budgeted for this increase.").  Plaintiffs have objected to the posting of a bond, suggesting that TRICARE may never recover the costs incurred.[16]  *See* Pls. Mem. In Support of a Prelim. Inj. at 43-45 (contending that the posting of a bond would render the preliminary injunction meaningless).

In addition, if the Court were to require TMA to temporarily cover ABA therapy while this action remains pending in district court, it would disrupt the orderly operation of the payment of benefits within TRICARE and sow confusion among the private contractors, health care providers, and beneficiaries who participate in the TRICARE system.  *See* O'Bar Decl. ¶ 6b ("changing the reimbursement structure for ABA" would require TRICARE contractors "to revise processes for authorization of ABA benefits and reprogram claims processing systems to allow payment of the additional claims."); *see also id.* ¶ 6c ("TMA would be required to direct its [contractors] to make changes to the automated claims processing systems").  A court should not lightly interfere with the administration of a vast and complicated program like TRICARE, and it should be even more hesitant to do so through preliminary relief that may be mooted in less than six weeks.

Finally, it is in the public interest for TMA to complete its review process rather than

---

[16] In contrast, if ABA is ultimately determined to be covered under the Basic Program, plaintiffs, as well as other beneficiaries, could seek reimbursement for monies they spent on ABA.

have this Court opine on whether ABA is covered under the Basic Program without the benefit of an administrative decision. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, . . . is inextricably linked with the merits of the case."). In particular, "it is in the public interest to deny injunctive relief when the relief is not likely deserved under the law." *See Majhor v. Kempthorne*, 518 F.Supp.2d 221, 256 (D.D.C. 2007) (citations and quotations omitted). Even if plaintiffs were ultimately to prevail, the proper remedy would not be to order TMA to reimburse for all ABA therapy but would be to remand to the agency for further consideration and investigation. *See Fla. Power & Light Co. v. Lorion,* 470 U.S. at 744 ( a "reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed" but should, when necessary, "remand to the agency for additional investigation or explanation"). It is in the public interest to have an orderly process to conduct an assessment of medical procedures and technologies in which there is a known and consistent standard for the scientific/medical evidence to be considered and weighed. And, if the final agency decision is subject to review, then there would be a complete administrative record for this Court to review.

## **CONCLUSION**

For the reasons stated herein, the government respectfully requests that this Court deny plaintiffs' motion for a preliminary injunction.

Dated: September 23, 2010                    Respectfully submitted,

                                            TONY WEST
                                            Assistant Attorney General

- 31 -

RONALD C. MACHEN JR.
United States Attorney for the District of Columbia

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

_/s/_____
ADAM D. KIRSCHNER
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
<u>Mailing Address</u>
P.O. Box 883
Washington, D.C., 20044
<u>Delivery Address</u>
20 Massachusetts Ave., NW., Room 7126
Washington, DC 20001
Telephone: (202) 353-9265
Fax: (202) 616-8470
Adam.Kirschner@usdoj.gov

ATTORNEYS FOR DEFENDANTS