**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KENNETH BERGE, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 10-0373 (RBW) |
| ) | |
| UNITED STATES OF AMERICA, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OPINION**

The named plaintiffs, Kenneth Berge and Dawn Berge, on behalf of themselves and all other individuals similarly situated,[1] filed Plaintiffs' First Amdended [sic] Class Action Complaint ("Am. Compl.") on December 13, 2010, against the following defendants: the United States of America, the United States Department of Defense (the "DoD" or "Agency"), the TRICARE Management Activity (the "TMA"),[2] and Robert M. Gates, then United States Secretary of Defense.[3] The First Amdended [sic] Complaint, brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (2006), challenges the TMA's position "that ABA

---

[1] The Court preliminarily granted class certification under Federal Rule of Civil Procedure 23(b)(2) to the following class: "All individuals with autism who are TRICARE Basic [P]rogram beneficiaries, and their parents and guardians, and who currently or in the future seek TRICARE Basic [P]rogram coverage for [Applied Behavior Analysis] therapy." Order at 1, Berge v. United States, No. 10-0373 (D.D.C. March 4, 2011). Class certification was preliminarily granted pending the Court's resolution of the cross-motions for summary judgment that are the subject of this Opinion.

[2] TMA is the field activity within the Department of Defense that administers the TRICARE Basic Program. Defendants' Memorandum In Support of Their Motion to Dismiss Or, In the Alternative, to Hold This Action In Abeyance at 2.

[3] The Court has substituted Leon E. Panetta, the current United States Secretary of Defense, for former Secretary Gates pursuant to Federal Rule of Civil Procedure 25(d).

[Applied Behavioral Analysis] therapy is a covered benefit only under [a supplemental program for active duty members] and is not a covered benefit pursuant to the TRICARE Basic health benefits program," which covers both active duty and retired members of the United States Armed Services.  Am. Compl. ¶ 168; 10 U.S.C. § 1086; see also Defendants' Memorandum in Support of Their Cross-Motion For Summary Judgment and In Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Mem.") at 1.  This case is now before the Court on the parties' cross-motions for summary judgment.  See Plaintiffs' Renewed Motion for Summary Judgment ("Pls.' Renewed Mot."); Defendants' Motion for Summary Judgment ("Defs.' Mot.").[4]  For the following reasons, the Court will grant the plaintiffs' motion for summary judgment and deny the defendants' cross-motion for summary judgment.

### I. Background

A.    The Class Plaintiffs

The class plaintiffs are active duty and retired uniformed service members of the United States Armed Services and their dependent children who have been diagnosed with some form of autism, and who, at some point, have had payment reimbursement requests refused for the ABA intervention provided to these children.[5]  Am. Compl. ¶¶ 1-11. As beneficiaries of the DoD's

---

[4] In addition to the filings already identified, the Court considered the following submissions in rendering its decison: (1) Plaintiffs' Class Action Complaint and Demand for Jury Trial ("Compl."); (2) Plaintiffs' Statement of Points and Authorities in Support of Motion for Class Certification ("Pls.' Mem. to Certify"); (3) Statement of Points and Authorities in Support of Plaintiffs' Renewed Motion for Summary Judgment ("Pls.' Mem."); (4) Plaintiffs' Reply Memorandum in Support of Their Renewed Motion for Summary Judgment and Memorandum in Opposition to Defendants' Cross-Motion for Summary Judgment ("Pls.' Reply"); (5) Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defs.' Reply"); and (6) Defendants' Memorandum In Support of Their Motion to Dismiss Or, In the Alternative, to Hold This Action In Abeyance.

[5] Autism is a developmental disorder and will be described in fuller detail later in this opinion.

health care system ("TRICARE," id. ¶ 40, also known as "CHAMPUS," id. ¶ 96), [6] the plaintiffs assert that "TRICARE wrongfully refuses to provide coverage pursuant to the TRICARE Basic [P]rogram for ABA therapy," id. ¶ 41.

B.      Statutory and Regulatory Framework

Congress enacted Section 1079 of Title 10 of the United States Code in order to "assure that medical care is available for dependents . . . of members [and "former members"] of the uniformed services."  10 U.S.C. § 1079 (2006).  The statute instructs the Secretary of Defense, "after consulting with other administering [Agency] Secretaries," to contract "for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate."  Id.  In accordance with this mandate, the DoD adopted a regulation to implement the statute.  See generally 32 C.F.R. § 199 (2011).

The TRICARE Basic Program, which, as noted earlier, is a health benefits program for current and retired members of the United States Armed Services, "is similar to private insurance programs, and is designed to provide financial assistance to . . . beneficiaries for certain prescribed medical care obtained from civilian sources."  Id. § 199.4(a).  In addition to paying for medical services for active and retired military members, the Basic Program also provides coverage for the members' dependents, including spouses, id. § 199.3(b)(2)(i), and children, id. §

---

[6] The "Basic Program will pay for medically necessary services and supplies required in the diagnosis and treatment of illness or injury."  32 C.F.R. § 199.4(a)(1)(i).  As the defendants point out, many of the regulations and case law interpreting those regulations still refer to the Program as "CHAMPUS," as opposed to TRICARE.  The "Basic Program" under TRICARE is available to, among others, retired service members and the dependents of both active duty and retired service members, while TRICARE's Extended Health Care Option ("ECHO") is available only to active duty service members and their dependents.  See 32 C.F.R. § 199.4-.5.

3

199.3(b)(2)(ii).  The TMA is the component of the DoD that administers the Basic Program.[7]

Defs.' Mem. at 4.

Under the Basic Program, the term "medical" refers "to the diagnosis and treatment of illness, injury, pregnancy, and mental disorders by trained and licensed or certified health professionals."  32 C.F.R. § 199.2(b).  The Basic Program defines "mental disorder" as "a nervous or mental condition that involves a clinically significant behavioral or psychological syndrome or pattern that is associated with a painful symptom, such as distress, and that impairs a patient's ability to function in one or more major life activities."  Id.

Central to this case is the limitation imposed under the Basic Program authorizing payment for only "medically or psychologically necessary" treatments.  See id. §§ 199.4(a)(1)(i), 199.4(g)(1).  "Medically or psychologically necessary" is defined by the TRICARE regulation as "[t]he frequency, extent, and types of medical services or supplies which represent appropriate medical care and that are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of illness, injury, pregnancy, and mental disorders."  Id. § 199.2(b).

For services to qualify as "[a]ppropriate medical care," they must satisfy the following requirements:

(i) Services performed in connection with the diagnosis or treatment of . . . [a] mental disorder . . . which are in keeping with the generally accepted norms for medical practice in the United States;
(ii) The authorized individual professional provider rendering the medical care is qualified to perform such medical services . . . and[;]
(iii) The services are furnished economically.

---

[7] Although the TMA is the DoD component responsible for managing the Basic Program, the plaintiffs make a number of arguments in their motion directed at the DoD, rather than the TMA.  The Court will specifically reference both of these defendants throughout this opinion where appropriate.

Id.

In addition to requiring that covered treatments be medically or psychologically necessary, the Basic Program expressly excludes coverage for certain forms of medical treatments and procedures.  Specifically, the TRICARE regulation provides that "[a]ny drug, device, or medical treatment or procedure, the safety and efficacy of which have not been established, . . . is unprove[n] and cannot be cost-shared by [the Basic Program]."  Id. § 199.4(g)(15).  Under the Basic Program

> (i) [a] drug, device, or medical treatment or procedure is unproven:
> . . .
> (C) Unless reliable evidence shows that any medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis.
> . . .
> (D) If reliable evidence shows that the consensus among experts regarding the medical treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated doses, its toxicity, its safety, or its effectiveness as compared with the standard means of treatment or diagnosis . . . .

Id. §  199.4(g)(15)(i).   Under this standard, only "reliable evidence" can be considered in determining whether a medical treatment or procedure is unproven, and therefore excluded from Basic Program coverage.  Id.

In compliance with this regulation, the TMA must determine whether a certain treatment or procedure satisfies the reliable evidence standard before deciding to approve or deny it.  See id. § 199.4(g)(15)(i)(C).  The DoD regulation further provides that

> the term reliable evidence means only:
> (i) Well controlled studies of clinically meaningful endpoints, published in refereed medical literature.
> (ii) Published formal technology assessments.
> (iii) The published reports of national professional medical associations.
> (iv) Published national medical policy organization positions; and
> (v) The published reports of national expert opinion organizations.

Id. § 199.2(b). Moreover, "[t]he hierarchy of reliable evidence of proven medical effectiveness, established by [the above-listed categories], is the order of the relative weight to be given to any particular source." Id. "Specifically not included in the meaning of reliable evidence are reports, articles, or statements by providers or groups of providers containing only abstracts, anecdotal evidence or personal professional opinions." Id. Finally, "the fact that a provider or a number of providers have elected to adopt a . . . medical treatment or procedure as their personal treatment or procedure of choice" is not considered a reliable indicator of the effectiveness of a treatment. Id.

In addition to the Basic Program, the DoD administers the TRICARE Extended Care Health Option ("ECHO") program, which "is essentially a supplemental program to the TRICARE Basic Program." Id. § 199.5(a)(1). The ECHO program "provide[s] an additional financial resource for an integrated set of services and supplies designed to assist in the reduction of the disabling effects of the ECHO-eligible dependent's qualifying condition." Id. § 199.5(a)(2). The ECHO program is limited to dependents of active duty personnel who have a qualifying condition. See 10 U.S.C. § 1079(d)(3) (2006). Although the ECHO program does not require that the medical treatment be medically or psychologically necessary to be covered, see id. § 1079(e)(7) (granting the Secretary of Defense discretion to provide coverage under the ECHO program even if the treatment is not medically or psychologically necessary), it does exclude unproven drugs, devices, and medical treatments in the same manner as the Basic Program, see 32 C.F.R. § 199.5(d)(12) (excluding from ECHO coverage unproven "[d]rugs, devices, medical treatments, diagnostic, and therapeutic procedures for which the safety and

efficacy have not been established in accordance with [the relevant provisions of the Basic Program]").

C.      Factual and Procedural Background

Autism "is a complex developmental disability, which adversely affects, among other things, verbal and nonverbal communication and social interactions, a child's educational performance, and the overall ability of a person who suffers from the condition to function in society." Pls.' Mem. at 49; see also Administrative Record ("A.R."), Volume (Vol.) III, Tab 8-2-13, (NIMH,[8] Autism Spectrum Disorders Pervasive Development Disorders (2008) ("NIMH: Development Disorders")) at 477-78. Common symptoms exhibited by individuals with autism include "impaired social interaction, impaired communication abilities, . . . decreased motor skills, tantrums, . . . and unusual responses to sensory experiences." Pls.' Mem. at 49; see also A.R.,Vol. III, Tab 8-2-13 (NIMH: Development Disorders) at 477. In 2007, the United States Marine Corps "count[ed] 784 active duty family members (of all ages) with a diagnosis of [autism] enrolled in its" Exceptional Family Member Program. A.R., Vol. III, Tab 8-2-7 (2007 Report and Plan on Services to Military Dependant Children with Autism ("DoD 2007 Report")) at 411. The plaintiffs allege, without directing the Court to any support, that "[t]he Department of Defense estimates that 1 in every 88 members of the armed services has a dependent with [autism]." Am. Compl. ¶ 31.

Although there is no cure for autism, ABA therapy has emerged as an intervention that can help children cope with the disorder. A.R., Vol. III, Tab 8-2-13 (NIMH: Development Disorders) at 491. ABA therapy is "a systemized process of collecting data on a child's

---

[8] NIMH is the acronym for the National Institutes of Mental Health.

behaviors and using a variety of behavioral conditioning techniques to teach and reinforce desired behaviors while extinguishing harmful or undesired behaviors." Pls.' Mem. at 1; see also A.R., Vol. I, Tab 4 (Hayes Report Dated October 25, 2010 ("2010 Hayes Directory")) at 55. "ABA therapy is an intensive, extremely detailed and enormously nuanced psychosocial, behavioral intervention . . . [and] is, therefore, expensive." Am. Compl. ¶ 32; see also A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 55. "Effective ABA treatment requires 25-40 hours per week of services, usually over a period of years." Am. Compl. ¶ 33; see also A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 55.

The named plaintiffs of the class in this case are the parents of Z.B., "a minor child [who has been diagnosed] with autism." Am. Compl. ¶ 40. "On April 11, 2007, . . . [Z.B.'s p]ediatrician . . . diagnosed [the then] two-year old . . . with Autistic Disorder Infantile, Full Syndrome." Plaintiffs' Statement of Points and Authorities in Support of Motion for Class Certification ("Pls.' Mem. to Certify") at 10. The day after Z.B.'s diagnosis, his mother "contacted TRICARE's Managed Care Support Contractor for the Southeast Region, Value Options" and was informed that because Z.B.'s father had retired from active service with the United States Air Force, Z.B. was eligible only to receive benefits under the Basic Program, and not the ECHO program. Id. at 11. Because Z.B. was ineligible for ECHO benefits, the family was informed "that Z.B. [was] ineligible for benefits related to ABA services." Id. Thereafter, Z.B.'s parents continually sought to obtain reimbursement for Z.B.'s ABA intervention services but their requests were repeatedly denied. Id. at 11-12. For example, in one denial letter the parents were given the following explanation:

> After careful reconsideration of this case, including all additional information, the second physician reviewer agrees with the Outpatient Psychiatric initial denial.

> Based upon the opinion expressed by the second physician reviewer, the initial denial is upheld.
>
> This determination was based on:
>
> The sponsor of the beneficiary in not on active duty.  ABA therapy cannot be authorized unless the beneficiary is enrolled in the ECHO program.  A requirement for participation in the ECHO program is that the sponsor be on active duty.  In this case, the sponsor is retired and therefore the beneficiary is not eligible for the ECHO program.  The requested ABA therapy services cannot be authorized.

Pls.' Mem, Exhibit ("Ex.") 11 (June 18, 2007 Z.B. Denial Letter) at 3.[9]

On March 5, 2010, the plaintiffs filed this action in this Court under the APA, challenging the June 18, 2007 decision by the TMA denying coverage for Z.B.'s ABA therapy, which, as noted, was based on the conclusion that the plaintiffs did not qualify for ABA therapy reimbursement because they were not eligible to participate in the ECHO program.  Defs.' Mem. at 9.  "On June 22, 2010[,] the [Agency] moved to dismiss [this action] for lack of a final agency action, or, in the alternative, moved to stay the proceedings until a final decision . . . was issued." Id.  The Agency argued that the June 18, 2007 decision was not final because the TMA reopened the decision to consider whether ABA therapy is covered under the Basic Program.  Id. (arguing that "[a]n initial determination for a claim for reimbursement under TRICARE is final unless . . . the initial determination is reopened") (internal quotation marks and citation omitted).  Agreeing with the Agency that there had been no final agency action, the Court allowed the Agency additional time to review the plaintiffs' request for benefits but declined to dismiss this case.

Ultimately, "[o]n October 29, 2010, the Chief of TRICARE Appeals issued a formal review decision denying reimbursement to [the] plaintiffs for ABA therapy under the TRICARE

---

[9] Some of the exhibits submitted by the parties are not numbered.  Therefore, the Court has taken the liberty of assigning them numbers consistent with the order in which they appear on the Court's electronic filing system.

Basic Program for their dependent's [autism]." Id. at 11. As a result of that decision, the Court ordered the plaintiffs to file an amended complaint challenging the October 29, 2010 decision. See Order, Nov. 19, 2010 (Dkt. #71), at 1 (ordering the Agency to produce the complete administrative record and ordering the plaintiffs to file an amended complaint). On December 13, 2010, the plaintiffs filed their amended complaint, alleging that the "denial of coverage pursuant to the TRICARE Basic [P]rogram is arbitrary, capricious, and contrary to law and regulation." Am. Compl. ¶ 169.

Following the defendants' submission of the administrative record, the plaintiffs filed their motion for summary judgment on December 17, 2010. See generally Pls.' Renewed Mot. In their motion, the plaintiffs argue that: (1) the DoD's policy denying ABA therapy under the Basic Program is not entitled to deference under Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), Pls.' Mem. at 7; (2) ABA therapy satisfies the definition of medical care under the Basic Program, id. at 31-32; (3) ABA therapy is medically or psychologically necessary under the Basic Program, id. at 38; and for these reasons the Court should conclude that the October 29, 2010 decision denying the plaintiffs coverage for ABA is contrary to law, id. at 75.

In response, the Agency filed a cross-motion for summary judgment, along with a memorandum in opposition to the plaintiffs' motion. See generally Defs.' Mot. The Agency argues that: (1) under Chevron, the Court should accord deference to the DoD's decision, Defs.' Mem. at 14-15; (2) ABA therapy is an educational intervention rather than medical care under the Basic Program, id. at 30-31; (3) even if ABA therapy qualifies as medical care, it is not proven medical care under the Basic Program, id. at 34; and, therefore, the Court should

conclude that the October 29, 2010 decision "was based upon a rational connection to the" administrative record, id. at 39.

## II. Standard of Review

"Because this case involves a challenge to a final administrative action, the Court's review is limited to the administrative record." Muwekma Ohlone Tribe v. Kempthorne, 452 F. Supp. 2d 105, 113 (D.D.C. 2006) (Walton, J.) (quoting Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995)). Furthermore, "summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)); see also Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977). However, due to the "limited role of [a] court in reviewing the administrative record," the typical summary judgment standard set forth in Rule 56(c) is not applicable. Stuttering, 498 F. Supp. 2d at 207 (citation omitted). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, [and] 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)).

The APA entitles a person who has suffered "legal wrong because of agency action, or [who has been] adversely affected or aggrieved by agency action," to judicial review. 5 U.S.C. § 702 (2006). Under the APA, a final agency decision must be set aside by a court if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. §

706(2)(A).  "The arbitrary and capricious standard of the APA is a narrow standard of review." Millican v. United States, 744 F. Supp. 2d 296, 302 (D.D.C. 2010) (internal quotation marks and citation omitted).  In Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Automobile Insurance Co., the Supreme Court explained the scope of a court's APA "arbitrary and capricious" review as follows:

> [A] court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.  In reviewing that explanation, [a court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43 (1983) (internal quotation marks and citations omitted); see also BellSouth Corp. v. FCC, 162 F.3d 1215, 1222 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.").  In conducting this review, considerable deference must generally be accorded to the agency.  See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Accordingly, "there is a presumption in favor of the validity of administrative action." Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 216 (D.D.C. 1996) (quoting Ethicon, Inc. v. FDA, 762 F. Supp. 382, 386 (D.D.C. 1991)).  Thus, so long as the agency explains "why it chose to do what it did," Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001) (internal quotation marks and citation omitted), and the court can "reasonably . . . discern[]" the agency's path, it must uphold the agency's decision, Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286

12

(1974)).  In making the determination of whether the agency's action should be upheld, courts review the administrative record as it existed at the time the agency made its decision.  See Florida Power & Light Co., v. Lorion, 470 U.S. 729, 743-44 (1985).  Finally, "the burden of showing that agency action violates the APA falls on the plaintiff[s]."  Banner Health v. Sebelius, 715 F. Supp. 2d 142, 153 (D.D.C. 2010) (Walton, J.).

As the Supreme Court has made clear, when a court assesses an agency's interpretation of "the statute which it administers," it must apply Chevron's two-step framework.  Chevron, 467 U.S. at 842.  At Chevron step one, the reviewing court must first attempt to determine whether "the intent of Congress is clear."  See id.  If "Congress has directly spoken to the precise question at issue," the reviewing court must be faithful to the clear congressional intent.  Id.  Thus, if Congress has "unambiguously foreclosed the agency's statutory interpretation[,]" the agency's interpretation must be rejected.  Catawba Cnty. v. EPA, 571 F.3d 20, 35 (D.C. Cir. 2009).  However, if the reviewing court finds that "statutory ambiguity has left the agency with a range of possibilities and that the agency's interpretation falls within that range, then the agency will have survived Chevron step one."  Village of Barrington v. Surface Transp. Bd., 636 F.3d 650, 660 (D.C. Cir. 2011).  At Chevron step two, a reviewing court must defer to an agency's interpretation of a statute, but only if the agency engaged in "reasoned decision[]making," which has been recognized to include "well-known factors almost in the nature of a checklist . . . [,] such as consideration of meaningful alternatives, a reasoned explication of the choice made, demonstrating a reasonable connection between the facts found and the option selected," that along with other "like" factors "are all in the nature of reasonableness-checking."  Cont'l Air Lines, Inc. v. Dep't of Transp., 843 F.2d 1444, 1451 (D.C. Cir. 1988) (internal quotation marks and citation omitted).  Considering only the rationales the agency furnished as the basis for its

decision, courts must also "determine whether [the agency's] interpretation is 'rationally related to the goals' of the statute." Barrington, 636 F.3d at 660 (quoting AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 388 (1999)).

### III. Legal Analysis

A.    Is Deference Owed to the Agency Decision (Chevron Step One)?

As an initial matter, the Court must address the plaintiffs' arguments that the DoD's decision to deny reimbursement for Z.B.'s ABA therapy is not entitled to Chevron deference. The plaintiffs make five arguments in support of this position:  (1) The Agency's policy of excluding ABA therapy from coverage under the military health benefits statute because it "is [not] medically or psychologically necessary, and appropriate medical care for [Autism Spectrum Disorder ("ASD")] that has been proven safe and effective in accordance with the reliable evidence standard as required by TRICARE regulations . . . ," A.R., Vol. I, Tab 1 (Formal Review Decision) at 7 (footnotes omitted),[10] is not entitled to deference because the statute "is unambiguous in light of its plain meaning, its legislative history, its internal [TRICARE] structure, the regulations promulgated under it, and the canons of [legislative] construction," Pls.' Mem. at 7; (2) the Agency "[h]as [t]aken [i]nconsistent [p]ositions [r]egarding ABA [t]herapy, [i]ncluding [s]hifting [i]ts [p]osition [p]ost-[h]oc [i]n [r]esponse to [the current] [l]itigation," id. at 9; (3) no deference is deserved "[b]ecause [m]ultiple [a]gencies [a]dminister the Military Health Benefits [s]tatute," id. at 15; (4) "[b]ecause the Military Health Benefits [s]tatute [s]trips the [Agency] of [a]ll [d]iscretion to [e]liminate or [r]educe [n]ecessary [h]ealth [c]are," id. at 17, "the Court [s]hould [n]ot [d]efer to" the Agency's decision in this case

---

[10] The page numbers cited are those assigned to the Administrative Record by the Agency.

because it "[e]liminates a [h]ealth [c]are [b]enefit," id.; and (5) "[u]nder the '[m]ajor [q]uestion' [e]xception to Chevron, an [a]gency [i]s [n]ot [e]ntitled to [d]eference when, as in the [i]nstant [c]ase, the Agency [v]iolates a [s]tatute's [c]ore [p]urposes, [w]hich [a]re [m]atters of [g]reat [m]oral, [e]conomic and/or [p]olitical [c]onsequence," id. at 21.  In the alternative, the plaintiffs contend that "[e]ven if [s]ome [d]eference [a]pplie[s], . . . [the Agency]'s [p]olicy [sh]ould [r]eceive the [m]ost [m]inimal [d]eference [b]ecause [i]t was [i]nformally [a]dopted."  Id. at 8. The Court will address the plaintiff's primary argument, the unambiguousness of the Military Health Benefits Statute, below.

1.      The Unambiguousness of the Military Health Benefits Statute

The plaintiffs first argue that the Agency's policy is not entitled to deference because the governing statute is unambiguous.  Id. at 7-8.  They contend "[i]t is crystal clear that Congress did not intend to exclude (as 'not medically or psychologically necessary' and not 'medical/health care') a medically and psychologically necessary, intensive, and enormously effective therapy like ABA, which is designed, supervised, and performed by highly trained and skilled professionals."  Id. at 7.   Based on their view that the statute is unambiguous, the plaintiffs reason that the Court has no choice but to "'give effect to Congress's unambiguously expressed intent'" that ABA therapy must be provided to the dependents of members of the armed forces.  Id. (quoting Beverly Health & Rehab. Servs. v. Nat'l Labor Relations Bd., 317 F.3d 316, 321 (D.C. Cir. 2003) (internal quotation marks and citation omitted)).

The Agency counters that "[t]he military health benefits statute does not unambiguously require ABA therapy to be covered under the TRICARE Basic Program," Defs.' Mem. at 14; rather, the Agency emphasizes that the statute states that therapies that are not "medically or psychologically necessary" are excluded from coverage under the statute.  Id. at 14-15 (quoting

15

Barnhart v. Walton, 535 U.S. 212, 218 (2002) (stating that "[a] Court is to defer to the Secretary's judgment unless the statutory text 'unambiguously forbids' his view or his interpretation 'exceeds the bounds of the permissible' for other reasons")).  The Agency asserts that because the statute does not expressly mandate coverage of ABA therapy, it is within the Agency's discretion to determine whether ABA therapy is in fact "medically or psychologically necessary" health care.  Id. at 14-15.  The Agency states that in interpreting what is "medically necessary," it "is restricted by the regulatory 'reliable evidence' standard."  Id. at 25.  The Agency contends that after an exhaustive administrative review of the reliable evidence contained in the administrative record regarding the efficacy of ABA therapy, it reasonably concluded that ABA therapy (1) does not meet the definition of medical care, but rather is an "educational intervention" aimed at modifying behavior, and (2) is not "proven" medical care. Id. at 19, 21, 31.  The Agency claims that the reliable evidence showed that ABA's function is to modify social behavior rather than treat the underlying illness of autism spectrum disorder, thus precluding ABA therapy from satisfying the definition of the term "medical," which is defined as pertaining to "the diagnosis and treatment of illness."  Id. at 31-32.  Moreover, the Agency asserts that "a review of [reliable] medical literature [demonstrates] that there is not a consensus on the efficacy of ABA as a medical treatment for ASD at this time."  Id. at 35.  Furthermore, the Agency argues that its conclusions are based on a "reasonable construction" of its regulation and that it is owed "substantial deference" in interpreting its own regulation.  Id. at 15.

The plaintiffs reply that only after the Court "draw[s] on all of 'the traditional tools of statutory construction,'" is it permitted to conclude that the statute is unambiguous.  See Plaintiffs' Reply Memorandum in Support of Their Renewed Motion for Summary Judgment and Memorandum in Opposition to Defendants' Cross-Motion for Summary Judgment ("Pls.'

Reply") at 12.  Moreover, the plaintiffs note that "[c]ourts, in their <u>Chevron</u> [s]tep [o]ne analysis, do not interpret statutory phrases in isolation, because the meaning or ambiguity of certain words or phrases may only become evident when placed in context."  <u>Id.</u> (internal quotation marks and citation omitted).  The plaintiffs insist that the Agency commits a fundamental error by simply assuming that it is entitled to <u>Chevron</u> deference "without employing any of the traditional tools of statutory interpretation" or refuting any of the plaintiffs' arguments based on those tools.  <u>Id.</u> at 13 (internal quotation marks omitted).  The plaintiffs further argue that because the Agency has never "provided an interpretation of its most fundamentally applicable regulations," the Agency's position that it is entitled to "substantial deference" because it is "interpreting its own regulations" is baseless.  <u>Id.</u> at 2-3.

The Agency counters, arguing that it has interpreted the relevant regulation and notes that it did include an explanation for its conclusion that ABA therapy is not medically or psychologically necessary health care, or in the alternative, that it is "unproven" care, in its Formal Review Decision, which is supported by an administrative record totaling more than 3,000 pages.  Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defs.' Reply") at 5-7.

The initial issue presented by the parties is whether the Agency's conclusion that ABA therapy is not <u>medically or psychologically necessary medical care</u> is entitled to deference by the Court.  As noted earlier, where a court concludes that a statute is unambiguous, the court must reject an agency's interpretation if it is inconsistent with clearly expressed congressional intent. <u>See</u> <u>Chevron</u>, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  Ambiguity can be determined by asking "whether Congress has delegated authority

to an agency by leaving a statutory gap for the agency to fill," Nat'l Mining Ass'n v. Kempthorne, 512 F.3d 702, 707 (D.C. Cir. 2008); see also Chevron, 467 U.S. at 843 ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.") (internal citation omitted), and the Court "owe[s] the Agency no deference on the existence of ambiguity." Am. Bar Ass'n v. FTC, 430 F.3d 457, 468 (D.C. Cir. 2005).

The District of Columbia Circuit has consistently required that, absent an explicit delegation of authority to an agency, there must be an implicit delegation of authority to the agency for Chevron deference to be accorded by the Circuit to an agency interpretation. See, e.g., Sea-Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 645 (D.C. Cir. 1998) ("[Chevron] deference comes into play . . . if the reviewing court finds an implicit delegation of authority to the agency."); City of Kansas City, Mo. v. Dep't of Housing & Urban Dev., 923 F. 2d 188, 192-93 (D.C. Cir. 1991) ("[I]mplicit delegation of interpretive authority," in absence of explicit delegation, is required for Chevron deference to apply). Furthermore, where Congress has delegated to an agency the authority to administer a program, a court should take special care not to encroach on that agency's implementation of the program, particularly in regards to the promulgation of program regulations. See Chevron, 467 U.S at 844 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."). In conducting the Chevron step one analysis, a court's inquiry is not limited to the statutory text, but rather a court "must examine the meaning of certain words or phrases in context and . . . exhaust the traditional tools of statutory construction, including examining the

18

statute's legislative history to shed new light on congressional intent." Sierra Club v. EPA, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  With this precedent as its guide, the Court turns to the parties' arguments regarding the clarity or ambiguity of the military health benefits statute and the scope of its delegation of authority to the Agency.

As noted above, the plaintiffs argue that the Agency's position is not entitled to deference because the statute unambiguously requires coverage of ABA therapy under the Basic Program. Pls.' Mem. at 8.   The Agency counters that the military health benefits statute does not unambiguously mandate ABA therapy coverage under the TRICARE Basic Program; rather, the statute provides a general guarantee of coverage unless the care is not "medically or psychologically necessary." Defs.' Mem. at 14.

The relevant statutory text at issue is 10 U.S.C. § 1079(a), which states:

To assure that medical care is available for dependents . . . of members of the uniformed services . . . the Secretary of Defense . . . shall contract . . . for medical care for those persons . . . .  The types of health care authorized under this section shall be the same as those provided under section 1076 of this title,[11]except . . . [a]ny service or supply which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction. . . .

---

[11] Section 1076(e)(3) of Title 10 of the United States Code states, in relevant part, that "[m]edical and dental care furnished to a dependent . . . shall be limited to the health care prescribed by section 1077 of this title."  Section 1077 lists the following categories of care: hospitalization; outpatient care; drugs; treatment of medical and surgical conditions; treatment of nervous, mental, and chronic conditions; treatment of contagious diseases; physical examinations, including eye examinations, and immunizations; maternity and infant care, including well-baby care that includes one screening of an infant for the level of lead in the blood of the infant; diagnostic tests and services, including laboratory and X-ray examinations; dental care; ambulance service and home calls when medically necessary; durable equipment, which may be provided on a loan basis; primary and preventive health care services for women; preventive health care screening for colon or prostate cancer; prosthetic devices, as determined by the Secretary of Defense to be necessary because of significant conditions resulting from trauma, congenital anomalies, or disease; a hearing aid; any rehabilitative therapy to improve, restore, or maintain function, or to minimize or prevent deterioration of function, of a patient when prescribed by a physician.  See 10 U.S.C. § 1077(a)(1)-(17).

See 10 U.S.C. § 1071 ("The purpose of this chapter is to create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents.") (emphasis added).  Because the Agency is correct in stating that the statute does not explicitly mandate coverage for ABA therapy, but instead contains a general guarantee of health care-related coverage unless the care is "not medically or psychologically necessary," see 10 U.S.C. § 1079(a), the question the Court must resolve is whether Congress intended to delegate authority to the Agency to interpret the phrase "not medically or psychologically necessary," and thus allow it to determine which services fall under this exclusion.  See National Mining Ass'n, 512 F.3d at 707 ("Chevron analysis begins with asking whether Congress has delegated authority to an agency by leaving a statutory gap for the [A]gency to fill.").

The Court must begin its inquiry by examining the plain language of the statute.  See Am. Bankers Ass'n v. Nat'l Credit Union Admin., 271 F.3d 262, 267 (D.C. Cir. 2001) ("Chevron step one analysis begins with the statute's text . . . .").  The specific words selected by Congress in a statute may be instructive in assessing whether it intended to delegate interpretive authority of the terms in question through the adoption of regulations.  See Nat'l R.R. Passenger Corp. v. Boston & Me. Corp., 503 U.S. 407, 418 (1992) ("The existence of alternative dictionary definitions of the word 'required,' each making some sense under the statute, itself indicates that the statute is open to interpretation.") (internal citation omitted).  Here, 10 U.S.C. § 1079 does not define what the phrase "not medically or psychologically necessary" care entails, nor does it provide definitions of these terms. The very ambiguity of these terms indicates Congress's intent to delegate authority to the Agency to interpret them.

In National Mining Ass'n, the District of Columbia Circuit evaluated whether the phrase "valid existing rights" in the Surface Mining Control and Reclamation Act[12] was ambiguous. 512 F.3d at 704. The Secretary of the Interior interpreted the phrase narrowly, requiring mining operators seeking to mine coal on federal land to satisfy two stringent conditions. Id. at 705. Satisfaction of these requirements had the effect of essentially foreclosing surface mining operations on federal lands designated as sensitive areas. Id. The plaintiff argued that the Agency's interpretation of the phrase was too narrow and shielded more land from surface mining than Congress intended. Id. at 706. The District of Columbia Circuit began its analysis by concluding that the term "valid existing rights" was ambiguous, observing that "[t]he [plaintiff], reaching for its dictionary, notes that the word 'right' could be taken to mean 'property right[,]' . . . [b]ut according to the same dictionary on which the [plaintiff] relies, this is not the only meaning the word will bear." Id. at 708. Given the ambiguity of the word "rights," the Circuit reasoned that it was "hard for [it] to conclude that" "Congress ha[d] directly spoken to the precise question at issue." Id. (internal citation omitted); see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 989 (2005) ("[W]here a statute's plain terms admit of two or more reasonable ordinary usages, the [Agency's] choice of one of them is entitled to deference."); AFL-CIO v. FEC, 333 F.3d 168, 174 (D.C. Cir. 2003) ("[T]he fact that the provision can support two plausible interpretations renders it ambiguous for purposes of Chevron analysis.").

Here, to determine whether the terms—medically, psychologically, necessary, and medical—are ambiguous and subject to multiple definitions, the Court consults the same source

---

[12] 30 U.S.C. §§ 1201, 1272(e) (2006).

considered by the Circuit in <u>National Mining Ass'n</u>: dictionaries.  512 F.3d at 707; <u>see also</u> <u>AKM LLC v. Sec'y of Labor, Dept. of Labor</u>, 675 F.3d 752, 755 (D.C. Cir. 2012); <u>Nat'l R.R.</u> <u>Passenger Corp</u>, 503 U.S. at 418. Based on its review of dictionary definitions of each term, the Court finds that the phrase "not medically or psychologically necessary" suffers from ambiguity in the same manner that the phrase "valid existing rights" did in <u>National Mining Ass'n</u>.[13]

In <u>National Mining Ass'n.</u>, the "major source of . . .  ambiguity [was] the word 'rights.'" 512 F.3d at 708.  The Circuit noted that, among other definitions, a "right" could mean "an interest or title in an object of property" or a "legally enforceable claim that another will do or will not do a given act."  <u>Id.</u> (internal quotation marks and citations omitted).  Moreover, a "right" can "do service more generally," standing for "[s]omething that is due to a person by just claim, legal guarantee, or moral principle."  <u>Id.</u>

The word "medically" is a derivative of and has the same meaning as the word "medical."  Similar to the definition of the word "right" in <u>National Mining Ass'n.</u>, "medical" and "necessary" both have multiple definitions and are thus subject to the same ambiguity, which is magnified when the words are interpreted together as a phrase.  "Medical" can mean "relating to, or concerned with physicians or the practice of medicine" or "requiring or devoted to medical treatment," <u>Medical Definition</u>, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/medically, while "necessary" can mean "of an inevitable nature," "absolutely needed," "compulsory," or "determined or produced by the previous condition of things," <u>Necessary Definition</u>, Merriam-Webster Online Dictionary, http://www.merriam-

---

[13] Although the term psychologically does not suffer from the same ambiguities and multiple definitions as the other terms, the Court must construe the phrase "medically or psychologically necessary" as a whole in assessing its ambiguity.

webster.com/dictionary/necessary.  For example, the stark difference between a treatment that is "determined or produced by the previous condition of things" and a treatment that is "compulsory" illustrates this ambiguity.  Id.  It is therefore uncertain whether a treatment must be compulsory, or merely "determined . . . by the previous condition of things" in order for it to be covered under the Basic Program.  Id.  Both words lend themselves to multiple interpretations, thus "render[ing the words] ambiguous for purposes of Chevron analysis."  Nat'l Mining Ass'n, 512 F.3d at 708 (internal quotations marks and citation omitted).  Especially in the context of the circumstances underlying the dispute in this case, either definition could lead to different conclusions that fall within "a range of possibilities" under the statute.  Barrington, 636 F.3d at 660.

Moreover, when viewing the two terms collectively as a phrase, the determination of which forms of medical or psychological care are necessary is also subject to interpretation, particularly here, where Congress left each of the terms, and the phrase itself, undefined.  In the absence of such definitions, this Court, like the Circuit in National Mining Ass'n, 512 F.3d at 708, cannot conclude that Congress has directly answered the question of what types of health care are not medically or psychologically necessary.

With the adoption of the Dependents' Medical Care Act statute, Congress created a military health care system to "provid[e] an improved and uniform program of medical and dental care for members of the uniformed services and their dependents." Pub. L. No. 84-569, 70 Stat 250 (1956).  The authority to implement this health care program was, moreover, delegated to the Secretary of Defense by Congress.  See 10 U.S.C § 1079(a) ("[T]he Secretary of Defense, after consulting with the other administering Secretaries, shall contract, under the authority of this section, for medical care for those persons under such insurance, medical service, or health

plans as he considers appropriate."); see also Ike Skelton National Defense Authorization Act for Fiscal Year 2011, Pub. L. No. 111-383, § 711, 124 Stat. 4137, 4246 (2011) ("[T]he Secretary of Defense shall have responsibility for administering the TRICARE program and making any decision affecting such program."). Because Congress specifically delegated authority to the DoD to implement and make decisions affecting the military's health care program, this Court must take care to avoid infringing on the Agency's authority. See Morton v. Ruiz, 415 U.S. 199, 231 (1974); see also Chevron, 467 U.S. at 844 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . .").

In their Renewed Motion for Summary Judgment, the plaintiffs argue that the DoD's interpretation of the types of services that are not medically or psychologically necessary is owed no deference by the Court because "[t]he statute here is unambiguous in light of its plain meaning, legislative history, its internal structure, the regulations promulgated under it, and the canons of construction." Pls.' Mem. at 7. Specifically, the plaintiffs posit that "[i]t is crystal clear that Congress did not intend to exclude . . . a medically and psychologically necessary, intensive, and enormously effective therapy like ABA, which is designed, supervised, and performed by highly trained and skilled professionals." Id. The plaintiffs note that the congressionally declared purpose of the statute is to "create and maintain high morale in the uniformed services by providing an improved program of medical . . . care," id. at 26 (citing 10 U.S.C. § 1071), and argue that the Agency's "conclusion that ABA therapy is excluded from Basic coverage[] as 'not medically or psychologically necessary' . . . is not in harmony with the 'design of the statute as a whole and . . . its object and policy,'" id. at 27. However, in arguing that the Agency's ABA therapy exclusion is contrary to the core purposes of the military health

24

benefits statute, the plaintiffs erroneously conflate the Chevron step one and Chevron step two analyses. As noted above, the key inquiry in Chevron step one is whether the statute is ambiguous and whether Congress delegated authority to the Agency to fill those statutory ambiguities. See FDA. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000) ("Deference under Chevron [step one] to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps."). Only after a court determines that deference is warranted due to statutory ambiguity or silence will a court proceed to Chevron step two to assess whether an agency's interpretation of a statute is contrary to its core purpose. Am. Bankers Ass'n, 271 F.3d at 267 ("Only if we find the statute either silent or ambiguous with respect to 'the precise question at issue' do we proceed to Chevron's second step, asking 'whether the agency's answer is based on a permissible construction of the statute.'") (quoting Chevron, 467 U.S. at 842-44). Therefore, the question of whether the statute's core purpose of providing improved health care to military families conflicts with the Agency's construction of the statutory language, as the plaintiffs argue, is irrelevant for purposes of Chevron step one, and is only appropriate for the Court's consideration under Chevron step two.

In summary, with regard to Chevron step one, the Court concludes that the disputed language of the statute is ambiguous because it is subject to more than one definition. Moreover, the statutory language expressly delegates sole authority to the Agency to implement and make decisions with respect to the Basic Program. See 10 U.S.C § 1079(a); see also § 711, 124 Stat. at 4246. Congress's delegation of authority to the Agency to administer the TRICARE health care program, coupled with Congress's use of undefined and ambiguous language, i.e., the phrase "not medically or psychologically necessary," is persuasive evidence that Congress left a

25

gap in the statutory language for the Agency to fill.  See Menkes v. U.S. Dep't of Homeland Sec.,

637 F.3d 319, 330 (D.C. Cir. 2011) ("The power of an administrative agency to administer a

congressionally created program necessarily requires the formulation of policy and the making of

rules to fill any gap left, implicitly or explicitly, by Congress.").  Accordingly, because the

phrase "medically or psychologically necessary" introduces ambiguity into the statute, the Court

will advance to step two of the Chevron analysis, and will defer to the Agency's conclusion if

reasonable and permissible under the statute. [14]

B.    Is The Agency's Interpretation Arbitrary and Capricious or Contrary to Law (Chevron
      Step Two)?

The Court, having determined "that statutory ambiguity has left the [A]gency with a

range of possibilities and that the [A]gency's interpretation falls within that range, . . . the

[A]gency . . . ha[s] survived Chevron step one," and the Court must now proceed to Chevron

---

[14] The plaintiffs offer five additional arguments as to why the Agency does not deserve deference under Chevron step one.  The Court need not consider the argument that the statutory language explicitly strips the Agency of its discretion because the Court has already found the statutory language to be ambiguous.  In addition, the plaintiffs' argument that the Agency does not deserve deference because it lacks exclusive administrative authority over the military health benefits statute is unpersuasive because Congress delegated to the Secretary of Defense sole "responsibility for administering the [Basic P]rogram and making any decision affecting such program."  10 U.S.C. § 1073(a)(2) (emphasis added).  Furthermore, the plaintiffs argue that whether ABA therapy is covered under the Basic Program is of such importance that Congress would have addressed it in the statute, and, as such, it falls under the "major question" exception to the Chevron analysis.  However, the Court finds that whether ABA therapy is covered does not present such an "extraordinary case[]" so as to render it subject to the exception.  See Brown & Williamson, 529 U.S. at 123.  The plaintiffs' argument that the Agency adopted its policy regarding ABA therapy coverage through "informal policymaking," and not a "formal adjudication," Pls.' Mem. at 9, is irrelevant because the Supreme Court has stated that "the fact that [an] Agency . . . reache[s an] interpretation through means less formal than 'notice and comment' rulemaking does not automatically deprive that interpretation of the judicial deference otherwise its due,"  Barnhart, 535 U.S. at 221 (internal citation omitted), and, as stated above, the military health benefits statute expressly granted sole authority to the Secretary of Defense to "administer[] the [Basic P]rogram and mak[e] any decision affecting such program,"  10 U.S.C. § 1073(a)(2) (emphasis added).   The plaintiffs' remaining argument, that the Agency's exclusion policy has been inconsistent, Pls.' Mem. at 9, is not a proper argument for determining whether the Agency is owed deference because inconsistency is a factor considered under the Chevron step two "arbitrary and capricious" analysis, and has no bearing on whether an agency is owed deference under Chevron step one, see Nat'l Cable & Telecomms. Assoc. v. Brand X Internet Servs., 545 U.S. 967, 981 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the Chevron framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice . . . .").

step two.  Barrington, 636 F.3d at 660.  "At [this second step of the] Chevron [analysis, the Court must] defer to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose th[e] interpretation," id. (emphasis added), that explanation "is rationally related to the goals of the statute," id. at 665 (internal quotation marks and citation omitted), and there has not been "a clear error of judgment," New Life Evangelistic Ctr., Inc. v. Sebelius, 753 F. Supp. 2d 103, 113 (D.D.C. 2010).  Furthermore, "unlike [the review at] Chevron step one[,] . . . at this stage [the standard of review] is highly deferential" to the agency.  Barrington, 636 F.3d at 665 (internal quotation marks and citation omitted).

　　　　1.　　　　Arbitrary and Capricious Analysis

At Chevron step two, the Court may not disturb an agency rule unless it is "arbitrary or capricious in substance, or manifestly contrary to the statute."  Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 242 (2004).  In reviewing a case under the arbitrary and capricious standard of review, a court "must consider whether the [Agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  At a minimum, the Agency decision must have been based on a consideration of the relevant data and the "explanation of the basis for its decision must include 'a rational connection between the facts found and the choice made.'"  Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 626 (1986) (internal citation omitted).  An agency action will

> [n]ormally . . . be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 43 (emphasis added); see also BellSouth Corp., 162 F.3d at 1222 ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."). As noted, the "requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result." Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993).

        a.        Did The Agency Rely On Relevant Factors, Or Did It Rely On Factors Its Regulations Did Not Intend To Be Considered, or Did It Fail To Consider An Important Aspect Of The Problem?

The Agency asserts that its "assessment that ABA [is] not 'medically or psychologically necessary' was based on a consideration of the relevant factors needed to make such a decision and was a rational decision given the record before it." Defs.' Mem. at 21-22. On the other hand, the plaintiffs assert the following:

> In its October 2010 denial decision, [the] DoD simply concluded that 'ABA is an educational intervention and does not meet the TRICARE definition of medical care,' without actually exploring and applying the statutory and regulatory definitions of 'medical' and 'health care.' Instead of utilizing all of the language contained in the statutory and regulatory definitions for 'medical' and 'health care,' [the] DoD just sought out sources that used variations of three key words: 'education,' 'teach,' and 'instruction.' [The] DoD then declared, without any analysis, that ABA therapy is 'educational,' and, therefore, it cannot be 'medical.'" At the outset, [the] DoD did acknowledge the broad and liberal definition of 'medical'—but then refused to apply it.

Pls.' Mem. at 32-33.

As noted in Part III.A.1 of this opinion, supra at 19, 10 U.S.C. § 1071 authorizes a "uniform program[, TRICARE, for] medical [benefits] . . . for members and certain former members of [the Uniformed Services], and for their dependents." Specifically, the "[TRCIARE program] is authorized at Sections 1079, 1086, and 1091 [of Title 10] to contract with civilian

providers for the health care program benefits authorized under Section 1077." A.R., Vol. I, Tab

1 (Formal Review Decision) at 22.[15]

Under the TRICARE statute, medical care is available to dependents under Section

1079(a), which provides:

> To ensure that medical care is available for dependents, . . . the Secretary of Defense, after consulting with the other administering Secretaries, shall contract, under the authority of this section, for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate. The types of health care authorized under this section shall be the same as those provided under section 1076.

10 U.S.C. § 1079(a). Section 1076 of the statute provides that the medical care to which a

dependent is entitled shall be the same as that prescribed under Section 1077, which states:

> (a) Only the following types of health care may be provided under section 1076 of this title:
>
>> (1) Hospitalization.
>> (2) Outpatient care.
>> (3) Drugs.
>> (4) Treatment of medical and surgical conditions.
>> (5) Treatment of nervous, mental, and chronic conditions.
>> (6) Treatment of contagious diseases.
>> (7) Physical examinations, including eye examinations, and immunizations.
>> (8) Maternity and infant care, including well-baby care that includes one screening of an infant for the level of lead in the blood of the infant.
>> (9) Diagnostic tests and services, including laboratory and X-ray examinations.
>> (10) Dental care.
>> (11) Ambulance service and home calls when medically necessary.
>> (12) Durable equipment, which may be provided on a loan basis.
>> (13) Primary and preventive health care services for women (as defined in section 1074d(b) of this title).

---

[15] As stated above, although Article 10 of the United States Code provides the statutory authorization for providing services under the Basic Program, "Title 32 Part 199 of the Code of Federal Regulations (32 C.F.R. 199) prescribes the guidelines and policies for the administration of the [Basic] Program." A.R., Vol. I, Tab 1 (Formal Review Decision) at 22 (footnote omitted).

(14) Preventive health care screening for colon or prostate cancer, at the intervals and using the screening methods prescribed under section 1074d(a)(2) of this title.

(15) Prosthetic devices, as determined by the Secretary of Defense to be necessary because of significant conditions resulting from trauma, congenital anomalies, or disease.

(16) A hearing aid, but only for a dependent of a member of the uniformed services on active duty and only if the dependent has a profound hearing loss, as determined under standards prescribed in regulations by the Secretary of Defense in consultation with the administering Secretaries.

(17) Any rehabilitative therapy to improve, restore, or maintain function, or to minimize or prevent deterioration of function, of a patient when prescribed by a physician.

10 U.S.C. § 1077(a)(1-17).

The plaintiffs assert that "[t]he treatment of autism by ABA therapy falls within at least three categories of 'heath care' or 'mental health care' that are provided as TRICARE Basic [P]rogram benefits" under the statute: "[t]he treatment of a 'medical condition,' pursuant to 10 U.S.C. 1077(a)(4); [t]he treatment of a 'nervous, mental, and chronic condition,' pursuant to 10 U.S.C. 1077(a)(5); and [a] 'rehabilitiative therapy' to improve, restore, or maintain function, or to minimize or prevent deterioration of function, of the patient when prescribed by a physician,' pursuant to 10 U.S.C. 1077(a)(17)." Pls.' Mem. at 31.  On the other hand, the Agency states that "[b]ased on the[] definition[] and reliable evidence, [the] DoD concluded that ABA did not meet the definition of medical care, but rather found ABA to be an educational intervention aimed at modifying social behavior." Defs.' Mem. at 31.   The plaintiffs maintain that despite the DoD's exclusive reliance on the "reliable evidence standard" as the basis for assessing what coverage is available under the Basic Program, the regulatory definitions of "medically or psychologically necessary" are "only tangentially related" to the reliable evidence standard.  Pls.' Mem. at 43-44. Rather, the plaintiffs contend that "[a]s provided in 32 C.F.R. 199.2(b), the 'general acceptance' standard is what first and foremost defines whether a treatment is 'medically or psychologically

30

necessary' for purposes of the military health benefits statute." Id. at 44.  They further contend that "the regulatory definitions of [what is] 'medically or psychologically necessary' and 'medical [care]' do not even rely on the 'reliable evidence' standard, but rather rely on common-sense notions of 'general acceptance' and 'pertaining' to a mental disorder."  Pls.' Reply at 7. The Court agrees with the plaintiffs.

Pursuant to 32 C.F.R. §§ 199.2 and 199.4(g)(15), "[t]he TMA Deputy Director tasked the Chief [of the Medical Benefits and Reimbursement Branch ('MB&RB')] to determine whether ABA satisfies the . . . criteria for medically or psychologically necessary treatment, and appropriate medical care."  A.R., Vol. I, Tab 1 (Formal Review Decision) at 9.  The MB&RB Chief "concluded, in pertinent part, that: . . . ABA is not medically or psychologically necessary and appropriate medical care for ASD and that the reliable evidence reviewed indicates that ABA is an educational intervention and does not meet the TRICARE definition of medical care." Id. at 9-10.  In conducting this assessment, the MB&RB Chief undertook "an in depth review of the reliable evidence, such as medical literature and technology assessments, along with all documentation submitted by the Beneficiary." Id. at 9.  The assessment was then forwarded to the TMA Director, who concurred with the findings of the MB&RB Chief based on the evidence that had been reviewed and "a report by Hayes, Inc. (Hayes), a nationally recognized health technology assessment entity."  Id. at 10.  Specifically, "the Director of TMA reached the conclusion that ABA is not . . . covered under the Basic Program because it is (1) an 'educational intervention' rather than 'medical' care as contemplated by the [A]gency's regulations, and, alternatively, (2) not 'proven' medical care even if considered to be medical care."  Defs.' Mem at 26-27.

The plaintiffs argue that the Agency's explanation is insufficient because it fails to "meaningfully address[] its own regulations defining 'medically or psychologically necessary' or 'medical,'" but instead, "focuses selectively on the 'reliable evidence' regulation." Pls.' Reply at 7. Moreover, as noted earlier, the plaintiffs opine that "the regulatory definitions of 'medically or psychologically necessary' and 'medical' do not even rely on the 'reliable evidence' standard, but rather rely on common-sense notions of 'general acceptance' and 'pertaining' to a mental disorder." Id.

As an initial matter, the Court agrees with the plaintiffs that the Agency has failed to meaningfully address its own regulations and instead has concentrated on factors that the regulations do not contemplate in its determination of whether ABA is "medically and psychologically necessary" "medical care." The Basic Program covers "medically necessary services and supplies required in the diagnosis and treatment of illness or injury, including maternity care and well-baby care." 32 C.F.R. § 199.4(a)(1)(i). Furthermore, the term "medical" is defined as

> [t]he generally used term which pertains to the diagnosis and treatment of illness, injury, pregnancy, and mental disorders by trained and licensed or certified health professionals. For purposes of CHAMPUS, the term "medical" should be understood to include "medical, psychological, surgical, and obstetrical," unless it is specifically stated that a more restrictive meaning is intended.

32 C.F.R. § 199.2(b). Finally, the term "medically or psychologically necessary" is defined as follows:

> The frequency, extent, and types of medical services or supplies which represent appropriate medical care and that are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of illness, injury, pregnancy, and mental disorders or that are reasonable and adequate for well-baby care.

Id. (emphasis added).  The regulation's definitions of "medical care" and "medically and psychologically necessary" make no reference to the reliable evidence standard.  The reliable evidence standard only becomes a required consideration when the Agency is considering whether a treatment is proven or unproven.  See id. § 199.4(g)(15) (stating, in relevant part, that "[a]ny drug, device, or medical treatment or procedure, the safety and efficacy of which have not been established, as described in this paragraph (g)(15), is unproved and cannot be cost-shared by CHAMPUS except as authorized under paragraph 199.4(e)(26) of this part.  A . . . medical treatment or procedure is unproven . . . [u]nless reliable evidence shows that [it] has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis") (emphasis added).  Consequently, because the Agency erroneously reviewed whether ABA therapy is medically or psychologically necessary medical care under the "reliable evidence" standard, which is not required by the regulation and is therefore inconsistent with it, see Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (stating that an "agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation[;] . . . [i]n other words, [a court] must defer to the [agency's] interpretation unless an alternative reading is compelled by the regulation's plain language") (internal citation omitted); Lake Pilots Ass'n v. U.S. Coast Guard, 257 F. Supp. 2d 148, 174 (D.D.C. 2003) (finding the defendant acted arbitrarily and capriciously by failing to adhere to its own regulations), the Agency's decision was not based on consideration of the "relevant factors," Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 43.  Accordingly, in this regard the Agency has acted arbitrarily and capriciously and not in accordance with its own regulation.

b.      Was the Agency's Decision Rationally Related to the Choice Made
        Considering the Objectives of the Statute?

Alternatively, even if the Agency could demonstrate that it considered the relevant

factors in reaching its determination that ABA therapy is not medically or psychologically

necessary medical care, summary judgment in favor of the Agency would still be inappropriate

because it has not articulated a satisfactory explanation as to how its decision is "rationally

related" to the choice it has made in light of the statute's purpose, which is to "provid[e] an

improved and uniform program of medical and dental care for members of the uniformed

services and their dependents." Dependents' Medical Care Act, Pub. L. No. 84-569, 70 Stat. 250

(1956). Congress intended to achieve this objective by implementing a program that would

"discharge a moral obligation to the uniformed services, and . . . provide military personnel with

medical benefits comparable to those extended to federal civilian employees." Barnett v.

Weinberger, 818 F.2d 953, 965-66 (D.C. Cir. 1987).

At the second step of the Chevron analysis, courts must assess whether the Agency has

"examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including

a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n

of U.S., 463 U.S. at 43 (internal quotation marks and citation omitted). The District of Columbia

Circuit has stated that the "satisfactory explanation" prong includes an assessment of "whether

the [Agency] has reasonably explained how the permissible interpretation it chose is rationally

related to the goals of the statute." Barrington, 636 F.3d at 665 (internal quotation marks and

citation omitted). Despite the "highly deferential" standard owed to the Agency, id., the Court

cannot find that the Agency has satisfied Chevron step two based on these considerations either.

The Agency argues that its conclusion that "ABA is [n]ot [c]overed [u]nder the TRICARE Basic Program was [b]ased on a [r]ational [c]onnection to the [f]acts [b]efore [i]t." Def.'s Mem. at 29.  First, it represents that its determination that ABA is an educational intervention, as opposed to medical treatment, was based on consideration of its own regulation defining the terms "medical" and "medically and psychologically necessary," id. at 30 (citing 32 C.F.R. § 199.2(b)), as well as a "comprehensive review" of the relevant medical literature, which it concluded "showed ABA's function is to modify social behavior rather than treat the underlying illness of ASD,"  id. at 32-34 (citing, A.R., Vol. I, Tab 1 (Formal Review Decision) at 25-30).  The plaintiffs seem to argue in response that the Agency has not shown how its definitional regulation is rationally connected to its determination that ABA is not medically or psychologically necessary, in light of the Agency's failure to  "explain how it . . . conclude[d] that ABA therapy does not fit within this regulatory definition."  Pls.' Reply at 3.  Focusing on the regulation defining "medically and psychologically necessary," the plaintiffs assert that the Agency "has never even endeavored to discuss what 'general acceptance' is or who 'qualified professionals' are, let alone whether ABA meets these very reachable standards."  Id.  Turning to the Agency's definition of "medical," the plaintiffs contend that the Agency "needed to explain exactly how ABA therapy does not 'pertain to the treatment of a mental disorder'" to rationally conclude that it is not medically necessary.  Id. at 6.  The plaintiffs also maintain that Congress did not intend to exclude ABA coverage from the Basic Program.  Pls.' Mem. at 30.  Thus, the issue presented to the Court is whether the Agency's decision comports with the evidence that was before it.

An agency's interpretation of a statute and its own regulations "ultimately prevails, if at all, only by virtue of the persuasive power it exerts."  Barnett, 818 F.2d at 964.  If an agency fails

to provide a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," Banner Health, 715 F. Supp. 2d at 153 (internal quotation marks and citation omitted), the Court should not "stand aside and rubber-stamp . . . affirmance of [the] decision[] [if it] deem[s the decision] inconsistent with a statutory mandate or [it] frustrates the congressional policy underlying a statute," Barnett, 818 F.2d at 964, (internal quotation marks and citation omitted). And here, a close examination of the objectives of the TRICARE statute, as well as the disorder and the therapy at issue, undermine the Agency's decision.

(i) The Purpose of the CHAMPUS/TRICARE Statute

"The CHAMPUS statute and regulations were enacted to 'create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents . . . .'" Britell v. United States, 372 F.3d 1370, 1379 (Fed. Cir. 2004) (quoting 10 U.S.C. § 1071). With the enactment of the statute, Congress intended to "discharge a moral obligation to the uniformed services, and to provide military personnel with medical benefits comparable to those extended to federal civilian employees." Barnett, 818 F.2d at 965-66. The statute accordingly made healthcare for beneficiaries "an earned entitlement in gratitude for service to their country and as a means of enhancing and making more attractive service in the armed forces of the United States." McGee v. Funderburg, 17 F.3d 1122, 1124-25 (8th Cir. 1994).

The program fulfills this objective by "supplement[ing] the military's system of direct care for members of the armed services," Wilson v. CHAMPUS, 65 F.3d 361, 363 (4th Cir. 1995), with "financial assistance to beneficiaries of health care services rendered by civilian

36

health care facilities when such services are not available in military health care facilities," Green Hosp. v. United States, 23 Cl. Ct. 393, 395 (Cl. Ct. 1991). "CHAMPUS is not an insurance program where the insurer guarantees indemnification in return for a premium. Rather, CHAMPUS is funded by annual Congressional appropriations." Smith v. CHAMPUS, 97 F.3d 950, 952 (7th Cir. 1996). "[I]t is an 'at risk' program, meaning that unlike traditional health insurance programs, where beneficiaries usually know whether a treatment is covered beforehand, CHAMPUS beneficiaries typically receive medical care first and then submit a claim to CHAMPUS officials for an after-the-fact ruling on coverage." Id.

"The truly outstanding feature of the Dependents' Medical Care Act . . . is that it converted the provision of military-dependent medical care from a mere act of grace to a full-fledged matter of right." Barnett, 818 F.2d at 957. "[T]o assure that medical care is available for spouses and children of members of the uniformed services who are on active duty for a period of more than 30 days, the Act commands the Secretary of Defense . . . to 'contract for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate.'" Id. at 957-58 (quoting 10 U.S.C. § 1079(a)).

"While access to statutorily-authorized military-dependent medical care is a legal entitlement, Congress has imposed limitations on the types of care that CHAMPUS can supply . . . ." Id. at 958. In particular, "[a]ny service . . . which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness . . . as assessed or diagnosed by a physician [or] clinical psychologist . . . may not be provided . . . ." 10 U.S.C. § 1079(a)(13). However, a "broad-gauged reading of the statutory exclusion[s] [would be] antithetical to the general statutory purpose, for the prime objective of the Dependents'

Medical Care Act was enhancement, not reduction, of the benefits to be accorded to military personnel and their dependents." Barnett, 818 F.2d at 963.

The DoD "has no registry specifically for beneficiaries with ASD; [thus,]. . . the prevalence of autism within the Military Health System is [not] known." A.R., Vol. III, Tab 8-2-7 (DoD 2007 Report) at 6. Despite this uncertainty, in 2007, "the Marine Corps count[ed] 784 active duty family members of all ages with a diagnosis of ASD." Id. In their amended complaint, the plaintiffs allege that the number of children of "active-duty military personnel [who] have been diagnosed with ASD . . . [is] 13,243 of [an] estimated [total of] 1.2 million children." Am. Compl. ¶ 120.

(a)     Autism Defined[16]

As discussed earlier, autism is classified as a Pervasive Developmental Disorder and is a neurobiological disorder that is "characterized by severe and pervasive impairment in several areas of development [, such as] reciprocal social interaction skills, communication skills, or the presence of stereotyped behavior, interests, and activities." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 69 (4th ed., text rev. 2000); see 34 C.F.R. § 300.8(c)(1)(i). Detectable at a very early age, autism affects the development and function of the brain resulting in "lifelong emotional, behavioral, social, and communication" difficulties. Brian

---

[16] Although some of the sources cited in this section of the opinion are not part of the administrative record, the Court may consider sources that are not part of the administrative record in order to gain an understanding of the disorder of autism and the medical terms used in reference to it. See O' Sullivan v. Metropolitan Life Ins. Co., 114 F. Supp. 2d 303, 310 (D.N.J. 2000) (stating that in an administrative agency review case, although a court is limited to evidence within the administrative record, where appropriate, a court may look outside the record to gain understanding of the medical terms or procedures concerning the claim before the court); see also Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 299 (5th Cir. 1999) (same). Here, the Court has consulted sources outside the administrative record to better understand and describe the disorder of autism.

Pace, Autistic Disorder, 285 JAMA 1798 (2001) ("Pace"). [17]   Children affected by this neurobiological disorder "do not always experience the same symptoms" and their "symptoms also depend on the severity of the disorder." Id.   Thus, autism has a range of severity, resulting in some autistic individuals being able to live independent lifestyles, while others are entirely incapable of supporting and providing for themselves. Id.

The number of individuals diagnosed with autism has increased in recent years. A.R.,Vol. III, Tab 8-2-13 (NIMH: Development Disorders) at 475.  Professionals who have been certified to properly conduct a diagnostic assessment are equipped to determine if a child has autism before the child is two years old.  Nat'l Research Council, Educating Children With Autism 3 (Catherine Lord & James P. McGee eds., 2001).  When diagnosing autism, such professionals assess the behavioral symptoms produced by the disorder.  Am. Psychiatric Ass'n, supra, at 75.  Three characteristics are commonly associated with autism: (1) "an inability to engage in reciprocal social interaction," (2) "both verbal and non-verbal communication difficulties," and (3) a "restricted imagination and a predilection for rigid routines."  F.J. O'Callaghan, Editorial, Autism: what is it and where does it come from?, 95 QJM 263 (2002).[18]

The first category is manifested by autistic children encountering social challenges that restrict their ability to interact socially with others.  A.R., Vol. III, Tab 8-2-13 (NIMH: Development Disorders) at 479-80.  According to the NIMH, autistic children "appear to have tuned the world out and are in their own worlds, not paying attention to others or engaging in

---

[17] JAMA is the acronym for the Journal of the American Medical Association.

[18] The QJM, a International Journal of Medicine, is a medical journal "focus[ing] on internal medicine and publish[ing] peer-reviewed articles which promote medical science and practice."  QJM, http://www.oxfordjournals.org/our_journals/qjmedj/about.html (2012).

normal social interactions." Cnty. Sch. Bd. of Henrico Cnty. v. R.T., 433 F. Supp. 2d. 657, 666 (E.D.Va. 2006) (citing Nat'l Insts. of Mental Health, Autism 3). Thus, affected children "avoid physical contact such as hugging and cuddling[, and] may also have difficulty interpreting the meaning of gestures and facial expressions such as smiling or winking." Pace, supra, 285 JAMA at 1798. Additionally, these children "avoid[] eye contact and display[] little of the interested curiosity and explanatory play seen in normal infants and young children." O'Callaghan, supra, 95 QJM at 263.

As to the second category, autistic children possess language and communication barriers that prevent them from "grasp[ing] the point of communication." Id. There are two components to this particular behavioral symptom: speaking and understanding. See id. In regard to the speaking component, "it has been estimated that half of [the] individuals affected by autism will remain mute throughout their lives." Pace, supra, at 1798. If autistic children are able to speak, they "may experience delays in language development or only repeat what they have heard." Id. When speaking, children with autism have challenges controlling the pitch, tone, and volume of their speech. O'Callaghan, supra, at 263. Also, affected children usually will have a "defect in understanding spoken speech [that] may be almost total, or may be subtle and merely take the form of literal interpretation of language." Id.

Lastly, individuals with autism typically display repetitive behavior, obsession with routine, and sensory problems. Pace, supra, at 1798. The repetitive behavior can be manifested by constant rocking or repetition of the same bodily movement. Id. Affected individuals normally develop "an obsessive need for a routine." O'Callaghan, supra, at 263. Thus, any deviation from the "usual pattern of life," such as "a book out of place in a bookcase or an altered route home from school," can cause minor outrage or temper tantrums. Id. In addition,

in most cases of autism, individuals portray signs of restricted imagination and have sensory problems to the degree that "certain sounds can be overwhelming." Id.; see also Pace, supra, at 1798.

These three types of manifestations are the common behavioral symptoms that lead to a diagnosis of autism. Am. Psychiatric Ass'n, supra, at 69. An early recognition of these characteristics or symptoms of autism can lead to an early diagnosis. See generally Nat'l Research Council, supra, at 195. And an early diagnosis is critical to the overall success of addressing autism, because it allows education and behavioral modification efforts to commence. Id.

(b)    Mitigating the Impact of Autism

Even though there is no available cure for autism, various forms of intervention have been developed to mitigate its symptoms and effects. Pace, supra, at 1798. These interventions are categorized in four different methods: (1) early intervention programs, (2) specialized education, (3) family support, and (4) medication. Id. Through early intervention programs, professionals provide educational and behavior training services that are designed to enhance the development of language and social skills. Id. These educational programs can take on a more specialized form, in which they focus on the individual's particular needs in order to "maximize the potential of each individual." Id. The success of these programs is bolstered by additional support from the family. Id. Normally, family members work with teachers and therapists to enable them to continue the training efforts in the child's home. Id. Such participation by the family becomes a constant support system for autistic individuals and the professionals who work with them. Id. Finally, certain symptoms can be treated with the use of medication, but

41

medications do not alleviate the targeted symptom, they merely minimize the frequency and effects of that symptom.  See id.

As the Agency's own report to Congress notes, "[w]ithin the field of autism, there are many approaches to intervention that are widely disseminated but little researched."  A.R. Vol. III, Tab 8-2-7 (DoD 2007 Report) at 411.  "Some approaches have been greeted with great enthusiasm initially, but have relatively quickly faded out of general use . . . ."  Id.  "Other approaches have withstood the test of time across sites and the children and families they serve . . . ."  Id.  "Education, both directly of children, and of parents and teachers, is currently the primary form of treatment for autism."  Id. (emphasis added).  These forms of intervention have come to be recognized as the most successful means of helping autistic individuals live more independent lives.  See Patricia Howlin, The Effectiveness of Interventions for Children with Autism, 69 J. Neural Transmission, Supplement, 101, 101 (2005).  And, many of these interventions focus on educational and behavioral trainings aimed at decreasing the effects of autism.  Id.  As noted earlier, one of these interventions is ABA therapy.

(c)    ABA Therapy

ABA therapy is the "application of behavioral principles to shape behaviors and teach new skills in an individual."  A.R., Vol. III, Tab 8-2-7 (DoD 2007 Report) at 8.  As a continuous chain of discrete "lessons one-on-one with a student taught with very clear beginnings and endings, repeated over and over, with positive reinforcement[,]" Gill v. Columbia 93 Sch. Dist., No. 98-4192-CV-C-66BAECF, 1999 WL 33486649, at *5 (W.D. Mo. June 9, 1999) (describing ABA therapy "used by O. Ivar Lovaas, Ph.D., at the University of California-Los Angeles"), ABA therapy focuses on "the use of rewards or reinforcement to encourage desired behaviours and the elimination or reduction of unwanted behaviours by removing their positive

consequences by means of 'time out,' 'extinction,' or punishment," Kostas Francis, Autism Interventions: A Critical Update, 47 Developmental Med. & Child Neurology 493, 495 (2005). ABA therapy is designed to help autistic children "in any skill area that is delayed and, at the same time, . . . [allow for] grow[th in their] areas of strength," A.R.,Vol. III, Tab 8-2-13 (NIMH: Development Disorders) at 493, along with maintaining those "newly learned skills" "to improve socially significant behavior to a meaningful degree," A.R., Vol. III, Tab 8-2-7 (DoD 2007 Report) at 412-13.

ABA therapy is a specialized intervention administered by a "professional with advanced formal training in behavioral analysis." McHenry v. PacificSource Health Plans, 679 F. Supp. 2d 1226, 1232 (D. Or. 2010). To be nationally certified, the Behavior Analyst Certification Board requires that an analyst have "a masters degree and several hundred hours of graduate level instruction or mentored or supervised experience with another" board certified behavioral analyst. Id. (citing Behavior Analyst Certification Bd., Standards for Board Certified Behavior Analyst, http://www.bacb.com/index.php?page=158 (last visited July 12, 2012)). In administering ABA therapy, the intervention program starts with numerous hours of individualized instruction in the child's home and ends with several hours of instruction in more socialized settings, such as a school environment with the opportunity to interact with peers. C.M. ex rel. J.M. v. Bd. of Educ. of Henderson Cnty., 85 F. Supp. 2d 574, 585 (W.D.N.C. 1999) (citing the testimony of Dr. Jacqueline Wnynn, Director of the Lovass Institute).

ABA therapy is an economically "costly" program, and can be physically and emotionally demanding on the family of a child diagnosed with autism. McHenry, 679 F. Supp. 2d at 1232. The family members of an affected child become a core component of the intervention because they must invest a substantial amount of time at home reinforcing the

therapy so that the "gains made by the child with his therapist are not lost." C.M. ex rel. J.M., 85 F. Supp. 2d at 585. Thus, the parents are "expected to help . . . generalize the skills learned during therapy to the everyday world." Id. Although costly, ABA therapy has been proven to be effective and generally beneficial to children diagnosed with Pervasive Developmental Disorders. See McHenry, 679 F. Supp. 2d at 1232. Most important, if initiated at an early age, autistic children may see greater improvement, mitigating the symptoms of autism. A.R.,Vol. III, Tab 8-2-13 (NIMH: Development Disorders) at 485, 490, 501.

(ii).     The Applicability of the TRICARE Statute to Autism

As noted previously, the purpose of the TRICARE Basic Program is to "create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents." Britell, 372 F.3d at 1379 (quoting 10 U.S.C. § 1071). Congress specifically endeavored to create a program to "discharge a moral obligation to the uniformed services, and to provide military personnel with medical benefits comparable to those extended to federal civilian employees." Barnett, 818 F.2d at 965-66. Most important, the statute's Basic Program covers "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). The term "medical" "pertains to the diagnosis and treatment of illness, injury, pregnancy, and mental disorders by trained and licensed or certified health professionals." 32 C.F.R. § 199.2(b) (emphasis added). The Basic Program defines the term "mental disorder" as "a nervous or mental condition that involves a clinically significant behavioral or psychological syndrome or pattern that is associated with a painful symptom, such as distress, and that impairs a patient's ability to function in one or more major life activities." Id. This definition seemingly encompasses autism, which is classified as a Pervasive

44

Developmental Disorder that is neurobiological and "characterized by severe and pervasive impairment in several areas of development[, such as] reciprocal social interaction skills, communication skills, or the presence of stereotyped behavior, interests, and activities." Am. Psychiatric Ass'n, supra, at 69. The defendants do not dispute that autism is a covered "mental disorder"; they instead argue that ABA therapy as a treatment intervention for autism is not a medically necessary service, focusing their attention on the fact that the treatment has a learning component. See A.R., Vol. I, Tab 1 (Formal Review Decision) at 27 ("We conclude . . . that regardless of how the intervention is oriented, that is, behaviorally such as ABA, or developmentally, . . . the over-arching methodology of the intervention is an educational process . . . .") (footnote omitted). But, this reality cannot be dispositive of whether ABA therapy is merely an educational intervention and not a form of treatment for autism because, as a mental disorder that often devastates individuals' ability to conform their behavior to social constructs, see A.R.,Vol. III, Tab 8-2-13 (NIMH: Development Disorders) at 477, it is only logical that the treatment for autism would include education as part of the behavioral modification effort. In other words, the educational component of ABA therapy does not automatically foreclose it as medical treatment. Therefore, the Court must conclude that the Agency's rationale based on this proposition was arbitrary and capricious.

        c.        <u>Is ABA Therapy "Unproven" "Medical Care," Even If It Qualifies as "Medical Care"?</u>

As noted earlier in this opinion, in accordance with its statutory mandate, the Agency has adopted a regulation for the administration of the TRICARE military health benefits program. See 32 C.F.R. § 199. The TRICARE Basic Program is described in 32 C.F.R. § 199.4(a), which provides that the "Basic Program is similar to private insurance programs, and is designed to

provide financial assistance to [TRICARE] beneficiaries for certain prescribed medical care obtained from civilian sources." Statutorily excluded from coverage is "[a]ny service or supply which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction." 10 U.S.C. § 1079(a)(13). The Agency, through its regulation, defines the term "medically or psychologically necessary" care as "[t]he frequency, extent, and types of medical services . . . which . . . are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of illness, injury . . . and mental disorders." 32 C.F.R. § 199.2(b) (emphasis added). Furthermore, medical care cannot be covered if it is unproven, as set forth in the following subsections of the regulation:

> A drug, device, or medical treatment or procedure is unproven . . . [u]nless reliable evidence shows that any medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its . . . safety, and its efficacy as compared with standard means of treatment or diagnosis, [or] if reliable evidence shows that the consensus among experts regarding the medical treatment or procedure is that further studies or clinical trials are necessary to determine . . . its safety, or its effectiveness as compared with the standard means of treatment or diagnosis.

32 C.F.R. § 199.4(g)(15) (emphasis added).

> [R]eliable evidence means only: (i) [w]ell controlled studies of clinically meaningful endpoints, published in refereed medical literature[;] (ii) [p]ublished formal technology assessments[;] (iii) [t]he published reports of national professional medical associations[;] (iv) [p]ublished national medical policy organization positions; and (v) [t]he published reports of national expert opinion organizations.

32 C.F.R. § 199.2.

In addition to the Basic Program, Congress established ECHO, an extended benefits program that is available only to active duty members and their dependents, which is also administered by the Agency. See 10 U.S.C. § 1079(d). The purpose of ECHO is "to provide an additional financial resource for an integrated set of services and supplies designed to assist in

the reduction of the disabling effect of the ECHO-eligible dependent's qualifying condition." 32 C.F.R § 199.5(a)(2). Care provided under ECHO is not limited to medical care, and the Agency has discretion to provide coverage for services determined by the Agency to be appropriate, "notwithstanding the limitations in subsection (a)(13)" that "[a]ny service or supply which is not medically or psychologically necessary . . . may not be provided." See 10 U.S.C. § 1079(e)(7) ("Extended benefits for eligible dependents under subsection (d) may include . . . [s]uch other services and supplies as determined appropriate by the Secretary, notwithstanding the limitations in subsection (a)(13)."). The Agency is therefore at liberty to reimburse active military service members for ABA therapy provided to their dependents without determining whether it was medically or psychologically necessary, whereas it cannot do so in the case of non-active duty service members.

This leaves the Court to determine whether the plaintiffs' reimbursement requests were properly denied on the basis that ABA therapy is unproven. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc., 463 U.S. at 43. The agency must nevertheless examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962). In reviewing the explanation for a decision provided by an agency, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) (internal citation omitted). Normally, courts will find agency action

47

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 43.

With this legal authority as its guide, the Court must resolve two questions in order to determine whether the Agency's determination that ABA therapy is unproven is arbitrary and capricious. First, the Court must examine whether the Agency's determination was based on a consideration of all the relevant factors. See Bowman Transp. Inc., 419 U.S. at 285. Second, the Court must determine whether there is a "rational connection" between the Agency's determination that ABA therapy is unproven and the facts it considered in making that determination. See Burlington Truck Lines, Inc., 371 U.S. at 168. Based on the information contained in the record and for the reasons set forth below, the Court must conclude that the Agency's determination that ABA therapy is unproven was arbitrary and capricious, contrary to law, or otherwise not in accordance with the law.

(i) Did the Agency Fail to Articulate a Satisfactory Explanation Due to its Reliance Solely on the Sources Referenced in its Final Formal Review Decision?

The plaintiffs argue that the Agency erroneously "dismissed . . . as not reliable," and therefore failed to give appropriate consideration to several studies they submitted to the Agency which identify ABA therapy as an effective treatment modality for ASD, all of which they contend comport with the Agency's reliable evidence standard. See Pls.' Mem. at 50-51 (stating that the Agency did not consider the following sources as reliable and therefore they were not accorded proper consideration in the Agency's decision: (1) an article with recommendations from the Association for Science in Autism Treatment ("ASAT"), (2) a report entitled "Mental

Health: A Report of the Surgeon General," (3) a letter from autism experts to the United States Armed Services Committee dated September 19, 2008, and (4) a letter from autism organizations to Secretary Gates dated May 19, 2008. Moreover, the plaintiffs assert that this error is particularly egregious because these sources are reliable sources under the Agency's own regulatory standard. Id. at 38-40.

The Agency counters the plaintiffs' arguments, representing that it based its final formal review decision on the following sources:

> (1) the applicable sections of Title 10 [U.S.C.] Chapter 55 . . .; (2) 32 C.F.R. Part 199 . . .; (3) policy manuals, instructions, procedures, and other guidelines issued by the Assistant Secretary of Defense for Health Affairs (ASD/HA), the TMA Director, or their designees . . .; (4) the record on appeal; (5) additional information and argument presented by the Beneficiary; (6) the technical assessment issued by the TMA Deputy Chief Medical Officer; (7) the TRICARE benefit determination approved by the TMA Director on October 19, 2010; and (8) the October 25, 2010, Hayes, Inc. technology assessment, [entitled] Intensive Behavioral Intervention for Autism.

A.R., Vol. I, Tab 1 (Formal Review Decision) at 2-3.

Although the Director of the TMA stated that he reviewed materials submitted by the plaintiff, id., he offers no specific insight regarding his consideration of those materials, nor does he explain why it was determined that some of the materials submitted to the Agency failed to satisfy its reliable evidence standard, id. at 11; see FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009) (finding that an agency must "examine the relevant data and articulate a satisfactory explanation for its action") (quoting Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 30); Burlington Truck Lines, 371 U.S. at 167-68 (declining to defer to an agency that provided "no findings and no analysis . . . to justify [its] choice," and stating that an agency decision "must be rational and based upon conscious choice" and that the agency must "disclose the basis of its order" after "mak[ing] findings that support its decision, . . . [that are] supported by substantial

evidence") (internal quotation marks and citation omitted).  In fact, in the Agency's opposition to the plaintiffs' motion for summary judgment, the Agency only references its failure to consider a provider's assertion that additional hours of therapy were needed for a patient as unsupported because "specifically not included in the meaning of reliable evidence are reports, articles, or statements by providers or groups of providers containing only abstracts, anecdotal evidence or personal professional opinions."  Defs.' Reply at 16 (citing 32 C.F.R. § 199.2); see also Defs.' Mem. at 25-27.  Because the Agency has failed to provide information on why certain materials were excluded as not reliable, other than citing to the regulation's definition and an explanation as to why a specific pediatrician/professional opinion was excluded, the Court is unable to "reasonably . . . discern the [A]gency's path," General Chem. Corp. v. United States, 817 F.2d 844, 854 (D.C. Cir. 1987) (internal quotation marks and citation omitted), which caused it to conclude on the one hand that certain materials in the Administrative Record were unreliable, while crediting other sources as reliable.

In its memorandum in support of its summary judgment motion, the Agency simply declares that its adjudication of the plaintiffs' case was based on the sources listed above, which it contends shows that it considered all of the relevant factors.  See Def.'s Mem. at 23 ("This adjudication, based on the technical assessment and benefit determination reviewed in light of the medical literature and [the A]gency's regulations, constitutes a consideration by DoD of the relevant factors for assessing whether ABA is covered under the TRICARE Basic Program.").  However, the Agency has failed to articulate why the sources submitted by the plaintiffs, for example, the United States Surgeon General's report entitled "Mental Health: A Report of the Surgeon General" (June 2, 2010), A.R., Vol. III, Tab 8-2-16 ("June 2010 Report of Surgeon

50

General"), do not constitute reliable evidence under 32 C.F.R. § 199.2, which as noted earlier provides, in relevant part:

> [r]eliable evidence means only (i) [w]ell controlled studies of clinically meaningful endpoints, published in refereed medical literature[;] (ii) [p]ublished formal technology assessments[;] (iii) [t]he published reports of national professional medical associations[;] (iv) [p]ublished national medical policy organization positions; and (v) [t]he published reports of national expert opinion organizations.

32 C.F.R. § 199.2. Specifically, the Agency has failed to explain why the plaintiffs' submissions do not constitute "published national medical policy organization positions," or "published reports of national expert opinion organizations." See id. Without a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," this Court must deem the Agency's action arbitrary and capricious. Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 43; see 5. U.S.C. § 706(2).

(ii)     Is the Agency's Reliance on Smith v. Office of Civilian Health & Medical Program of Uniformed Services Misplaced?

The Agency attempts to draw parallels between this case and Smith v. Office of Civilian Health & Medical Program of Uniformed Servs., 97 F.3d 950 (7th Cir. 1996), as support for the position that its "determination that ABA is not proven medical care" and that this decision is "not arbitrary or capricious or a violation of [its] regulations." Def.'s Mem. at 34-35. In Smith, the Seventh Circuit held that the DoD's determination that a therapy for breast cancer was experimental was not arbitrary or capricious or a violation of DoD's regulations because the medical value of the treatment was "hotly disputed among medical professionals." 97 F.3d at 961. The Agency notes that the Seventh Circuit's decision in Smith was "prophetic," as the therapy at issue eventually proved ineffective and arguably shortened the life of thousands of women who had received the treatment prior to leaning of its ineffectiveness. See Def.'s Mem.

51

at 35 ("By the time the studies were published conclusively showing that the procedure was ineffective, more than 30,000 women had already received the treatment, which often shortened their lives and added to their suffering, at a total cost of approximately $3 billion.") (quoting Peter D. Jacobson and Stefanie A. Doebler, "We Were All Sold a Bill of Goods": Litigating the Science of Breast Cancer Treatment, 52 Wayne L. Rev. 43, 45 (2006)).  The plaintiffs reply that the Smith court's holding was premised on its finding that the treatment at issue was the subject of "'widespread disagreement among qualified medical experts,'" and the "widespread controversy and hot dispute that existed in Smith simply does not exist here."  Pls.' Reply at 21-22 ("[E]very single statement favoring agency deference that [the defendant] quotes from Smith was conditioned on the Smith court's finding that the treatment at issue was extremely controversial.").

For two reasons, this Court is not persuaded that Smith supports the Agency's determination that ABA therapy is unproven.  First, as the plaintiffs aptly point out, the level of dispute and controversy over the breast cancer treatment at issue in Smith stands in stark contrast to the many members of the medical community's favorable assessment of ABA therapy. Compare, e.g., Smith, 97 F.3d at 961 (noting that "studies [concerning the treatment at issue] demonstrate[d], as d[id the] entire controversy, that the medical value of [the treatment] . . . [was] hotly disputed among medical professionals" (emphasis added)), with A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 55 ("The treatment of autistic children has undergone substantial change in the past 20 years, with behavior modification [referred to as IBI or ABA] replacing psychotherapy as the dominant and preferred treatment modality" (emphasis added)), and A.R., Vol. III, Tab 8-2-16 (June 2010 Report of Surgeon General) at 525 ("Thirty years of research demonstrated the efficacy of applied behavioral methods in reducing inappropriate behavior and

52

in increasing communication, learning, and appropriate social behavior."). In fact, the Smith court went so far as to conclude that the treatment at issue there was still experimental. 97 F.3d at 961 ("We are still left with the fact that on the record before us there is no convincing evidence that [the treatment] has moved beyond the experimental stage . . . .").

Here, there is no evidence that ABA therapy is the subject of such acrimonious debate within the medical community, as was the case in Smith; rather, there appears to be a general consensus that ABA therapy does indeed improve the functioning of children with ASD. See A.R., Vol. IV, Tab 11 (Focal Educational and Behavioral Interventions for the Treatment of Autism Spectrum Disorders (ASDs) From the ECRI Institute. Health Technology Assessment Information Service (2009) ("2009 ECRI Report")) at 572 ("[ABA therapy] was recommended by several guidelines groups."). While medical professionals in Smith disagreed as to the core medical value of the breast cancer therapy at issue as compared to more established treatments, 97 F.3d at 961, the studies concerning ABA therapy that were before the Agency in this case merely reflect that some in the medical community caution that even widely accepted treatments of autism, such as ABA therapy, not be viewed too optimistically, see id. ("[O]ne [study] cautioned against presenting the [program] as an intervention that will lead to normal functioning . . . and others specifically stated that although this treatment did demonstrate a trend towards positive outcomes, there was not enough evidence to support adopting a single autism treatment program as the gold standard."). Unlike the therapy at issue in Smith, ABA therapy is characterized by the technology assessments relied upon by the Agency as "the dominant and

preferred treatment modality,"[19] A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 55, which has provided concrete positive results for many autistic children, see, e.g., id. at 93 ("The findings . . . suggest that high intervention intensity positively predicts improvement both in IQ and adaptive behavior composite scores."); see also A.R., Vol. IV, Tab 10, (Comprehensive Educational and Behavioral Interventions for the Treatment of Austism Spectrum Disorders From the ECRI Institute. Health Technology Assessment Information Service (2008) ("2008 ECRI Report")) at 387 ("In general, . . . [ABA therapy] appears to improve intellectual functioning and adaptive behavior for some children with ASD."). The primary concern that the technology assessments appear to raise with respect to the efficacy of ABA therapy is the lack of consensus among medical professionals as to what intensity of intervention will result in autistic children realizing the maximum benefits from ABA therapy. See A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 93 ("[A]dditional research is necessary to establish optimal parameters for treatment intensity." (emphasis added)); see also A.R. Vol. IV, Tab 13 (Intensive Behavioral Intervention Therapy for Autism From Hayes, Inc. ("2008 Hayes Directory")) at 785 ("[T]he number of hours of [ABA] therapy required to produce optimal gains has not been established" (emphasis added)). Moreover, none of the technology assessments found ABA therapy ineffective, see, e.g., A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 53 ("[ABA] therapy generally improves visual-spatial skills and language skills relative to eclectic treatment [interventions developed specifically for children with] autism."), or identified other modes of treatments more effective in treating autism.

---

[19] Technology assessments, when referred to in this opinion, relate to the various studies that were reviewed by the Agency in rendering its decision on whether ABA is a covered treatment under the Basic Program. A number of reports and studies reviewed by the Agency assessed ABA treatment to ascertain its level of effectiveness.

Moreover, there is no evidence that ABA therapy carries any risk of harmful side effects, whereas in Smith there was considerable debate about the risks associated with the breast cancer treatment at issue in that case.  97 F.3d at 961.  It appears the Agency, in citing Smith, would have this Court believe that its determination that ABA therapy is unproven rests, at least partially, on its concern that ABA therapy may prove to be harmful to autistic children.  See generally Def.'s Mem. at 34-35, see also A.R., Vol I, Tab 1 (Formal Review Decision) at 8 (in explaining its decision, the Agency placed particular emphasis on 32 C.F.R. § 199.4(g)(15)(C)-(D), which states that a medical treatment is unproven where "further studies or clinical trials are necessary to determine . . . its safety.").  There is simply no evidence in the record to support the apparent suggestion that ABA therapy may prove to be harmful to autistic children.  The Court therefore dismisses Smith as inapplicable here.

> (iii)  Is the Defendant's Coverage of ABA Therapy Under ECHO, But Not Under the Basic Program, Arbitrary and Capricious, Contrary to Law, or Otherwise Not in Accordance With Law?

The plaintiffs argue that by providing coverage for ABA therapy under ECHO, the Agency has necessarily made a determination that ABA therapy is "safe" and "effective," Pls.' Reply at 7, because all services covered under the ECHO program, whether medical or therapeutic, are subject to the same efficacy requirements as those covered under the Basic Program, see Pls.' Mem. at 46-47; see also Pls.' Reply at 24 ("[T]he ECHO regulation that adopts by reference the 'proven' standard under the Basic Program, applies not only to 'medical care' but also to 'therapeutic services.'").  The Agency counters, arguing that although it is true that ECHO requires both medical and therapeutic treatments to satisfy the same reliable evidence standard as required under the Basic Program, the Agency "has great discretion in providing coverage under ECHO for other forms of treatment that can assist in the alleviation of a disabling

condition."  Defs.' Reply at 14; see also 10 U.S.C. § 1079(e)(7) ("Extended benefits for eligible dependents under subsection (d) may include . . . other services and supplies as determined appropriate by the [defendant], notwithstanding the limitations in subsection (a)(13).").

Since, as noted earlier, the Agency is correct in stating that Congress has granted it discretion to provide coverage for treatments under the ECHO program that are "not medically or psychologically necessary," see 10 U.S.C. § 1079, the issue for the Court to address is whether the Agency's decision to cover ABA therapy under the ECHO program without extending such coverage under the Basic program is nonetheless arbitrary and capricious, contrary to law, or otherwise not in accordance with the law.

The Agency's decision to provide, on the one hand, ECHO coverage for ABA therapy, while on the other hand, to withhold coverage under the Basic Program, is obviously contradictory because if the Agency concluded that ABA therapy is unproven, the Agency should not cover ABA therapy under either the ECHO or the Basic Program, because both programs are governed by the same "reliable evidence" standard.  The Court understands, and agrees with, the Agency's position that it has discretion to provide coverage for ABA therapy under the ECHO program, while withholding coverage under the Basic program.  See 10 U.S.C. § 1079(e)(7).  However, there is no apparent rational justification for the Agency's decision to exercise that discretion and provide coverage under one program but not the other in this case, because the applicable ECHO regulation, 32 C.F.R. § 199.5(d)(12), is governed by the same limitation as the Basic Program that precludes coverage for unproven "[d]rugs, devices, medical treatments, diagnostic, and therapeutic procedures for which the safety and efficacy have not been established in accordance with [32 C.F.R.] § 199.4—[the relevant provision of the Basic Program]."  Specifically, the ECHO Program regulation states:

> (i) [a] drug, device, or medical treatment or procedure is unproven:
>
> . . .
>
> (C) Unless <u>reliable evidence</u> shows that any medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis.
>
> . . .
>
> (D) If <u>reliable evidence</u> shows that the consensus among experts regarding the medical treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated doses, its toxicity, its safety, or its effectiveness as compared with the standard means of treatment or diagnosis . . .

<u>Id.</u> § 199.4(g)(15)(i) (emphasis added). Added to the Court's concerns about the inconsistent position the DoD has taken is the fact that the Agency itself has stated that "healthcare services" requiring ABA intervention were approved as "medically necessary . . . covered benefits" pursuant to the above regulation in a patient coverage determination in 2008. Plaintiffs' Motion for Summary Judgment to Set Aside, As Contrary to Law, Defendants' Policy That Applied Behavioral Analysis (ABA) Therapy Is "Special Education" Rather Than Health Care, Ex. 11 at 1. The regulation used as support for that decision relies on the same regulatory framework used to deny the same treatment to Z.B. under the Basic Program.

Also troubling is that the Agency's decision appears to run counter to several of its justifications for determining that ABA therapy is unproven care. Again, the Agency cites the Seventh Circuit's decision in <u>Smith</u> as support for its position, suggesting that its conclusion that ABA therapy is unproven was, as just noted, at least partially based on its concern that ABA therapy may have unknown and harmful side effects, and thus requires additional research to establish its safety. The Agency cannot rationally base its denial of ABA therapy coverage under the Basic Program on a concern that ABA therapy may be harmful to autistic children, while at the same time providing ABA therapy coverage under the ECHO program. Even under the most deferential review, the Court cannot comprehend a rational connection between the

57

Agency's decision to exercise its discretionary authority under Section 1079(e)(7) of Title 10 of the U.S. Code to provide coverage for ABA therapy under ECHO, while refusing to provide coverage for ABA therapy under the Basic Program based on safety concerns.

Furthermore, even if the Court could agree with the Agency's position that ABA therapy does not satisfy its standard for what constitutes proven care, the Agency has conceded that there is considerable evidence in the medical community demonstrating that ABA therapy is effective in treating some children with autism. See A.R., Vol. III, Tab 8-2-7 (DoD 2007 Report) at 408 ("ABA . . . is one of the best studied interventions. Time-limited, focused ABA methods have been shown to reduce or eliminate specific problem behaviors and teach new skills to individuals with autism."). One of the Court's primary tasks under Chevron step two is to determine whether the Agency considered the relevant facts before it and provided a satisfactory explanation for its decision. See Kristin Brooks Hope Ctr. v. FCC, 626 F.3d 586, 588 (D.C. Cir. 2010) ("[O]ur primary task is to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (internal quotation marks and citation omitted). While the Agency has provided an explanation for why it is not legally obligated to provide coverage under the Basic Program while providing coverage under ECHO, it has failed to provide a satisfactory explanation for why it has chosen not to extend coverage of ABA therapy under the Basic Program. The generally positive assessment of ABA therapy by the medical community coupled with the military health benefit statute's purpose of improving the "morale" of those who have served the country through military service, see 10 U.S.C. § 1071, are both relevant factors that the Agency failed to give due consideration in declining to extend coverage for ABA therapy under the Basic Program, while choosing to extend coverage under the ECHO program.

In light of the facts before it and the state of the law—the views of the medical community concerning the effectiveness of ABA therapy, Congress' express purpose for enacting the military health benefits statute, the Supreme Court's and the District of Columbia Circuit's jurisprudence requiring that statutes conferring benefits to Armed Service members be construed in favor of the beneficiaries, and the complete lack of evidence that ABA therapy may have harmful side effects—the Agency's decision to enforce its stringent regulatory standards to withhold ABA therapy coverage under the Basic Program, while exercising its statutorily-granted discretion to extend ABA therapy coverage under ECHO, seems highly suspect. The Court is left to speculate why the Agency chose to create this two prong regulatory scheme in light of the Agency's failure to provide a reasoned explanation for it. This deficiency alone is sufficient to render the Agency's decision to extend ABA therapy coverage to the ECHO program, without also extending coverage to the Basic Program, arbitrary and capricious. See Barrington, 636 F.3d at 660 ("At Chevron [s]tep [t]wo we defer to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation."). Accordingly, the Court finds that the Agency's decision to deny coverage for ABA therapy under the Basic Program is arbitrary and capricious and not in accordance with the law.

> (iv) <u>Did the Defendants Give Proper Consideration to the Purpose of the Military Health Benefits Statute In Determining That ABA Therapy is Not Proven Care?</u>

The Agency's determination that ABA therapy is unproven and thus not covered under the Basic Program is even more troubling when considered in context with the stated purpose for the military health benefits statute's adoption. See 10 U.S.C. § 1071 ("The purpose of this chapter is to create and maintain high morale in the uniformed services by providing an

improved and uniform program of medical . . . care . . . ."). The plaintiffs argue that any competing interpretations of the military health benefits statute must be construed in favor of the military families served by the statute. See Pls.' Mem. at 29 ("[A] court confronted with competing interpretations of the military health benefits statute [must] press a heavy interpretive thumb down on the side of the scale that favors military families and those who have sacrificed for the nation."). As support for their position, the plaintiffs rely on Barnett v. Weinberger, 818 F.2d 953 (D.C. Cir. 1987), where the Circuit rejected the Agency's interpretation of a "custodial care" exclusion under the military health benefits statute as overly broad because it deprived military families of care to which they were entitled. See id. at 963. ("[T]he regulations' broad-gauged reading of the statutory exclusion is antithetical to the general statutory purpose, for the prime objective of the [Military] Dependents' Medical Care Act was enhancement, not reduction, of the benefits accorded to military personnel and their dependents.").[20]

It is well-established that laws conferring benefits to members of the Armed Services must be construed generously in favor of the nation's military service members. See, e.g., King v. St. Vincent's Hosp., 502 U.S. 215, 221 n.9 (1991) ("[P]rovisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.") (citing Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285 (1946)); Coffy v. Republic Steel Corp., 447 U.S. 191, 193-96 (1980) (construing the Vietnam Era Veterans' Readjustment Assistance Act "liberally for the benefit of the returning veteran," and evaluating the underlying issue in the case

---

[20] The defendants do not address Barnett in the context of this argument. They reference it only in addressing whether ABA therapy is "medically or psychologically necessary." See Def.'s Mem. at 16, n. 12. In that discussion, the defendants attempt to distinguish Barnett from this case by arguing that the dispute in Barnett was not whether a certain therapy was medically necessary, as in this case, but rather whether the scope of the statutory exclusion for custodial care extended to care that was already deemed medically necessary. Id.

in light of this principle as well as others).  The purpose of the military health benefits statute, illuminated by the statutory language, is certainly another relevant factor the Agency should have considered in implementing the military benefits program.  See Motor Vehicle Mfrs. Ass'n of U.S., Inc., 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem . . . .").  Although this factor alone may be inconclusive, when considered in conjunction with the other factors considered by the Agency in making its determination that ABA therapy is unproven, it is questionable whether there was a rational connection between the determination about ABA therapy reimbursement and the purpose of the statute.  The Agency's determination would be more convincing if the efficacy of ABA therapy was seriously at issue, as was the situation in Smith; however, all of the reliable evidence considered by the Agency in making its determination contains some evidence of ABA therapy's effectiveness, and at least one technical assessment relied on by the Agency describes ABA therapy as the standard medical approach for treating autism.  See A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 55 (ABA is "the dominant and preferred treatment modality" for addressing autism).  The Agency's findings in its final decision fail to address the language of the military health benefits statute, which clearly articulates the purpose for creating the benefits program; thus, the Court is unable to discern whether the Agency even considered Congress's declared purpose for creating the program when reaching its determination that ABA therapy is unproven care.  See Household Credit Servs., 541 U.S. at 242 (explaining that as part of the Chevron step two inquiry, a court may not disturb an agency decision unless it is "arbitrary or capricious in substance, or manifestly contrary to the statute") (emphasis added); see also Barrington, 636 F.3d at 660 (noting that at Chevron step two, a court must "defer to the [A]gency's permissible interpretation, but only if the [A]gency has

61

offered a reasoned explanation for why it chose that interpretation," and if that explanation "is rationally related to the goals of the statute") (emphasis added) (internal quotation marks and citation omitted).  It is therefore difficult for the Court to conclude that the Agency has provided a "satisfactory explanation for its action including a rational connection between the facts found and the choices made." See Bus. Roundtable v. SEC, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

(v)    Did the Defendants Ignore Their Own Regulations In Declaring ABA Therapy "Unproven"?

The Agency has not demonstrated a rational connection between its conclusion that ABA therapy is unproven and the relevant factors it considered in its Formal Review Decision.  As discussed above, the sources the Agency considered in making its determination that ABA therapy is unproven do not suggest that ABA therapy is ineffective.  On the contrary, each of the technology assessments relied upon by the Agency indicates that ABA therapy has been shown effective in treating some children with autism.  See, e.g., A.R., Vol. I, Tab 4, 2010 (Hayes Report) at 53 ("[I]n general, the findings show that [ABA] therapy significantly raises IQ scores and increases the proportion of children in regular classroom settings."); A.R., Vol. IV, Tab 10 (2008 ECRI Report) at 322 ("After one year of treatment, children with ASD who receive [ABA therapy] score higher on tests of IQ."); A.R., Vol. IV, Tab 12 (Special Report: Early Intensive Behavioral Intervention Based on Applied Behavioral Analysis among Children with Autism Spectrum Disorders From the BlueCross BlueShield Association ("BCBS TEC Report")) at 720 (acknowledging that "ABA is among the most commonly cited and best-researched intervention for. . . children [with autism]"). While acknowledging these findings, the Agency seizes on language in these reports indicating that further research is needed to establish the efficacy of ABA therapy.  See Defs.' Reply at 21 ("These 'technology assessments' found that the efficacy

62

of ABA as a 'proven' 'medical' modality is not well-supported in the literature but rather additional research and better controlled studies [are] needed."). It is true, according to the Agency's own regulation, that a treatment is "not proven" if "reliable evidence shows that the consensus among experts regarding the medical treatment or procedure is that further studies or clinical trials are necessary to determine . . . its <u>safety, or its effectiveness as compared with the standard means of treatment or diagnosis</u>." 32 C.F.R. § 199.4(g)(i)(D) (emphasis added). However, the Court has identified several problems with the Agency's application of this regulation to the facts of this case.

First, none of the sources considered by the Agency in making its determination questions either the safety or the efficacy of ABA therapy. As discussed above, none of these assessments has provided any evidence that ABA therapy has negative side effects or that it may be harmful to children with autism. Second, each assessment includes several sources that satisfy the Agency's reliable evidence standard and demonstrate ABA therapy's effectiveness in treating some children with autism. Third, the Agency has not identified any forms of treatment superior to ABA therapy in terms of effectiveness in treating autism, nor has it identified any other autism treatment as the standard for the treatment of autism against which ABA therapy's efficacy can be compared pursuant to its regulation. <u>See</u> 32 C.F.R. § 199.4 ("A . . . medical treatment is unproven . . . [u]nless reliable evidence shows that any medical treatment or procedure has been the subject of well-controlled studies . . ., which have determined its . . . safety, and its efficacy <u>as compared with the standard means of treatment or diagnosis</u>." (emphasis added)). Because 32 C.F.R. § 199.4 specifically provides that a medical treatment's efficacy is properly determined in the context of how it compares to "standard means of treatment or diagnosis," it is significant that the Agency has not identified any treatment more

effective for treating autism than ABA therapy. See id. In fact, the assessments cited by the Agency suggest that behavioral modification therapy is the closest intervention medical professionals have identified as the standard means for treating autism. A.R., Vol. I, Tab 4 (2010 Hayes Directory) at 55 (ABA is "the dominant and preferred treatment modality" for autism). Therefore, this Court is left to wonder what forms of autism treatment would satisfy the Agency's regulatory requirement of being proven when the very sources the Agency relies upon to declare ABA therapy unproven cannot identify one form of treatment that is more effective than ABA therapy. Since the Agency has failed to articulate a reasoned explanation for its determination that ABA therapy is unproven, particularly in light of evidence before it suggesting the contrary, the Court must conclude that the Agency's determination is arbitrary and capricious. See Barrington, 636 F.3d at 660 ("At Chevron step two we defer to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation.").

## IV. Conclusion

In APA cases, "a district court reviewing a final agency action does not perform its normal role but instead sits as an appellate tribunal." Palisades Gen. Hosp. Inc., v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (internal quotation marks and citation omitted). "Thus, under settled principles of administrative law," once the Court has determined that the Agency "made an error," the case should "be remanded to the [A]gency for further action." Id. Although most of the Court's concerns could potentially be cured by affording the Agency further opportunity to explain its actions, the Agency's policy that ABA treatment is proven for the purpose of the ECHO program, but not for the Basic Program, cannot. Accordingly, because of this finding, "remand to the [A]gency for further review is an unnecessary formality." Fed. Election Comm'n

v. Legi-Tech, Inc., 75 F.3d 704, 709 (D.C. Cir. 1996); see also Cissell Mfg. Co. v. U.S. Dep't of Labor, 101 F.3d 1132, 1140 (6th Cir. 1996) (Stevens, J., dissenting) ("Just as . . . [case law] indicate[s] that remand is the usual remedy, the[re is] . . . also . . . [a] sole exception recognized . . . : a matter need not be remanded where . . . agency error renders a remand an unnecessary formality.")  The distinct circumstances of this case demonstrate that the Agency has already had ample opportunities[21] to take corrective action regarding the inconsistency between allowing coverage under ECHO while denying it under the Basic Program, despite being fully aware of the fact that the two programs are constrained by the same "unproven" standard and the Agency "failed to avail itself of this opportunity."  Id. at 1141.

Because the Agency's denial of ABA therapy coverage under the Basic Program is arbitrary and capricious, the Agency must therefore be enjoined from denying qualified beneficiaries coverage on the ground that ABA therapy is not a covered benefit under the TRICARE Basic Program.  Thus, the Court will remand this case back to the Agency with instructions that ABA therapy coverage be provided to Basic Program beneficiaries who otherwise qualify for reimbursement and such reimbursement be provided in compliance with the applicable TRICARE guidelines for the expenses incurred by qualified beneficiaries to acquire ABA therapy for their children.[22]  Accordingly, for the foregoing reasons, the plaintiffs'

---

[21] As noted in Part I.C of this opinion, supra at 9, the Court stayed these proceedings while the TMA reconsidered whether ABA therapy is covered under the Basic Program; the TMA ultimately issued a formal review decision denying reimbursement for ABA therapy, thus preserving the same inconsistency.

[22] In an earlier footnote, the Court noted that the plaintiffs were preliminarily granted class certification; however, now that the Court has thoroughly familiarized itself with the claims of the class, with the issuance of this opinion, the Court will grant the plaintiffs permanent class action certification pursuant to Federal Rule of Civil Procedure 23(b)(2).

65

motion for summary judgment is granted and the defendants' cross-motion for summary judgment is denied.

**SO ORDERED** this 26th day of July, 2012.[23]


REGGIE B. WALTON
United States District Judge

---

[23] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.